[Civ. No. 14826. First Dist., Div. Two. Dec. 10, 1951.]

CHRISTINE LAIRD CORNWALL, Appellant, v. THOMAS W. CORNWALL, Respondent.

James Martin MacInnis for Appellant.

Peart, Baraty & Hassard for Respondent.

GOODELL, J.—This is an appeal from an order granting the motion of defendant to modify a judgment of divorce with respect to custody.

The parties married on June 28, 1941, and lived in San Francisco. On May 5, 1942, a son was born and named Thomas George Cornwall. He is the only child, and was 8 at the time of the hearing.

On December 23, 1943, appellant filed suit for divorce on the ground of extreme mental cruelty. On May 5, 1944, an interlocutory judgment was entered, reciting that no evidence had been offered by defendant; that plaintiff was entitled to a divorce, and approving the agreement respecting property rights which had been executed. It awarded joint custody of the son to the parties and provided that plaintiff should have his physical custody with the right of defendant to visit him at all reasonable times, and to take him on an annual summer vacation for a reasonable period of time not exceeding

15 days. It ordered defendant to pay plaintiff $200 a month for the maintenance and support of the son. It also ordered him to pay plaintiff $200 a month for her own support and maintenance for a period of three years. There is no issue with respect to any of the payments.

Appellant and her son went to live with appellant's parents, named Laird, at their home in the Montecito district of Santa Barbara. A wing was added to the Laird dwelling which gave the plaintiff separate and ample living quarters for herself and son.

The final judgment was entered on May 18, 1945, incorporating by reference the provisions of the interlocutory judgment.

On June 4, 1947, defendant moved for a modification of the custody order and an order was made on September 16, 1947, that defendant be permitted to visit with the boy and take him with him at points at or near Santa Barbara on weekends from Friday afternoons to Monday mornings, at all reasonable times; that defendant be permitted to have the boy with him in his own home in San Francisco for the 1948 Easter vacation week and the 1949 Christmas vacation period, and that the boy should spend the 1947 and 1948 Christmas seasons and the 1949 Easter vacation period with his mother; also that defendant be permitted to take the boy with him to defendant's home in San Francisco, or elsewhere in California, for a period of 30 days during each summer school vacation.

On March 16, 1950, a notice of motion was served and filed by respondent which initiated the proceedings now under review. The motion was for an order changing the physical custody of the boy from the mother to the father. On May 17, 1950, appellant served and filed a countermotion respecting custody and counsel fees. Both motions were given a full and extended hearing which lasted for seven half-day court sessions and produced 331 pages of testimony. It of course comprehended many of the matters and incidents which had been before the court at earlier hearings. On July 26, 1950, the court ordered that the final judgment of divorce be modified as follows:

''1. The defendant . . . shall have forthwith the physical custody of said minor child until the further order of the Court, with the right of plaintiff to visit said minor child at all reasonable times; and, further, that the plaintiff shall

have the custody of said minor child during alternate Christmas and Easter school vacations, commencing with the Easter school vacation for the year 1951, and, further, that the plaintiff shall have the care and custody of said minor child for one month during each summer school vacation, commencing with the 7th day of July, 1950.

"2. That at the conclusion of the present month's vacation period, to-wit, August 8, 1950, plaintiff shall deliver the physical custody of the said minor child to defendant at her home in Santa Barbara.

"3. Said minor child shall not be taken or removed from the State of California by either parent without due notice to the other party and the order of the above-entitled Court, after application therefor;

"4. That defendant pay the sum of $250.00 to Messrs. Hallinan, MacInnis & Zamloch as attorneys for plaintiff for services rendered herein;

"5. That the motion of plaintiff for modification of said final decree, with the exception of the allowance of attorneys' fees as hereinabove set forth, be and the same is hereby denied;

"6. That, until further order of the Court, no further payments shall be made by defendant to plaintiff for the care, support and maintenance of said minor child."

In this record there is a very considerable volume of evidence which is wholly uncontradicted, and it will be reviewed first.

 *The religious question:* At the time of the boy's birth neither parent seems to have been much of a churchgoer. The infant was not baptized at that time or affiliated in any other way with any church or denomination. After the divorce and when the boy was 2½ or 3 years old his parents discussed the choice of a Sunday school and agreed on the Presbyterian Sunday school in Santa Barbara, which he attended for about a year.

Later appellant became a convert to Catholicism and was baptized by a priest in Santa Barbara. On February 23, 1947, when Tommy was almost 5, his mother had him baptized by a Catholic priest in Santa Barbara. The father, who is not a Catholic, was not consulted, and learned about it some time later.

Appellant testified under cross-examination: "Q. Didn't you just decide, yourself, to go to one particular church, and after that to determine where the boy was to go? A. Yes. Q. Without the father's knowledge? A. That's true. I know

Dr. Cornwall's brother was a Catholic, and I saw no reason to object.''

*The change of name question:* The birth certificate signed three days after Tommy's birth shows his name as Thomas George Cornwall. The baptismal certificate shows that when baptized he was given the name Thomas *Laird* Cornwall.

The father was not consulted respecting this matter.

There was considerable testimony respecting the earlier choice of the middle name ''George.'' The father testified:

''Q. Was the 'Tommy' for—of course, in your honor? A. For me, yes. . . .

''Q. And 'George' where does that come from? A. That was for my brother who passed away when he was 19 years old. In view of the fact that we were close—there was only two years between us; attended school together, the same classes, and high school, and our activities were together, and all our attentions were very, very close,—and Mrs. Cornwall agreed that the boy's name should be George, and she said she wished it to be Thomas George. I asked her how about the name of her father, and she said no. . . . She didn't want the name of 'Warren,' which was her father's—she didn't want that name. She wanted Thomas George. That was the name she would like. And we both felt that would be very satisfactory, and the birth certificate was registered in that way.''

Elsewhere respondent testified that ''George'' was the name of his father and grandfather, and a family name. Appellant testified that the name ''George'' was for respondent's ''brother, and grandfather, and maybe their father's, too; I am not sure'' and that the name had been in the Cornwall family for some generations back. On appellant's cross-examination the following appears: ''Q. Now, I notice in the baptismal certificate the name, I believe, appears as Thomas Laird Cornwall, is that right? A. Yes, that's right. Q. Who authorized that change? A. We go by the name Thomas. I said I would like to have the name Thomas Laird Cornwall. Q. Did you consult your former husband, the doctor, as to whether or not he would agree before changing the boy's name? A. No. It is not his legal name; it is his baptismal name. Q. And known by that among his friends? A. Yes. Q. And the records of the Catholic Church, of course, he is known that way, too? A. Yes.''

When Tommy started to school he was enrolled as Thomas

Laird Cornwall and is so carried on the school's records and so known by his schoolmates and other companions. That, too, was without the knowledge of his father.

*The school question:* When Tommy was old enough to attend school his mother entered him in a parochial school in Santa Barbara conducted by Catholic Sisters, which practically adjoins the Laird property. The father was not consulted respecting the kind or character of school which the boy should attend. He learned of it some time after Tommy had entered. Under cross-examination the defendant testified: "Q. Did you ever protest to Mrs. Cornwall about her choice of a parochial school for your son? A. The fact had been accomplished. He had been entered in the school for some length of time before I knew about the matter. Q. Do you now protest? A. I have no comment on that." Respondent testified elsewhere that he did not disapprove of the school.

Appellant was cross-examined on this subject as follows: "Q. Now, have you discussed with him as you have discussed with us, now, the matter of what school he was going to? A. Well, he went to the parochial school because of the emotional problem that he was facing. Q. Because of what? A. The emotional problem that Tommy was having, and I wanted him to have a good, strong, moral background. Q. Now, will you please answer my question: Did you discuss with your former husband the matter of his schooling? A. No. Q. You just took it upon yourself, without discussing that matter? A. Yes."

*The difficulties respecting week-end visits and vacations:*

During the year between the interlocutory and final judgments respondent made but three trips to Santa Barbara. Within a month after the final decree he moved for a modification of the custody order so that he could have the boy in San Francisco every three or four months for a period of four or six weeks. The basis of that motion was that war conditions and railroad transportation made it difficult for respondent to visit the boy at Santa Barbara. The motion was opposed by appellant and in presenting her opposition she made a serious charge on which the court found in respondent's favor. The motion was denied because the court found there had been no change of circumstances.

Thereafter the respondent's practice was to visit the boy in Santa Barbara whenever he could do so. He usually went

there on a Friday afternoon, took the boy to a near-by hotel, and returned him to his mother on Sunday evening.

With respect to the reasonableness of the times of these visits respondent habitually wired appellant well in advance. One wire gave 13 days' notice, several gave 7 or 8, several 4, and none gave less than two days' notice.

Respondent is a physician who has practiced in San Francisco as a child specialist since 1927. He has a busy practice and is on the staff of five San Francisco hospitals. He testified that whenever he made one of these trips he had to plan considerably in advance for the care of his patients in his absence. This meant employing another pediatrician at a considerable expense, and the briefing of the substitute doctor respecting the cases in hand.

Among the messages respecting these visits the record contains the following telegrams and notes exchanged between the parties from late in 1945 to the time of the hearing in 1950:

November 28, 1945, appellant to respondent: "My Christmas plans will not permit Tommy leaving me this season. Further it would be inconvenient to let Tommy go. He was available several times last summer. It seems strange that you should make this request immediately following recent court hearing."

December 17, 1946, respondent to appellant: "Expect to arrive by plane Friday afternoon December 20th" to which appellant replied "Tommy not available until Saturday morning December 21st."

July 15, 1947, respondent to appellant: "As per our arrangements together with you about three weeks ago I have planned to visit Tommy week end of July 19th and take him on vacation July 22nd. Expect to arrive afternoon July 19th" to which appellant replied: "You cannot have Tommy until case is settled. Do not come to Santa Barbara."

July 15, 1947, appellant to respondent: "Do not make plans to take Tommy this week. He is not available."

November 11, 1948, respondent to appellant: "Have planned to visit with Tommy during Thanksgiving holidays. Expect to arrive Wednesday afternoon November 24th" to which appellant replied by letter on November 15th: "Tommy should spend Thanksgiving in his own home. You may have him for the Thanksgiving week end beginning Friday morning."

March 14, 1949, respondent to appellant: "Plan to visit

with Tommy this week end. Expect to arrive March 18th," to which appellant replied: "Not convenient to visit Tommy this week end. Please change plans to following week end."

March 15, 1949, respondent to appellant: "Your telegram received. Stop. Will let you know later when I can again arrange to visit Tommy. For my future visits please advise by telegram collect whether first and third week ends or second and fourth week ends of each month will better suit your convenience." The Western Union reported that the wire was undelivered because the addressee had gone to the Clift Hotel, San Francisco. On March 23 Western Union advised respondent that the telegram had been delivered that day. On the 25th respondent wired appellant: "Please telegraph me collect your reply to my message which was sent to you on March 15th and which was delivered to you on March 23" to which appellant replied: "Continue visit as in the past. It is infrequent when inconvenience to me interferes with your visits."

An undated note was written by appellant to respondent reading as follows: "Dear Tom, I am planning to take Tommy to see Boulder Dam during the Easter holidays. I hope that will be all right with you. Tommy is leaning over my shoulder making suggestions. If this hot weather continues we will not go. Sincerely, Christine." By telegram dated April 18 [year?] respondent replied: "I consent that you take Tommy for a week's trip to Boulder Dam at this time with the understanding that you thereby consent to my taking him on a trip out of California at a later date. Please confirm by telegram collect" to which appellant replied by telegram dated April 18, 1949 "You have my permission to take Tommy on a trip out of the state provided Miss Cornwall does not accompany you."

On July 22 [year?] respondent wired appellant: "I am coming for Tommy on Sunday July 24 to take him on his annual thirty day vacation. Expect to arrive about noon. Please confirm by telegram collect." By a wire dated July 22, 1949, appellant replied: "I cannot let you have Tommy until case is settled."

On July 26 [year?] respondent wired appellant: "Plan to visit with Tommy this week end. Expect to arrive July 29th or 30th," to which appellant replied by wire on July 28, 1949: "Tommy and I will be out of town this week end." On July 29 respondent wired appellant: "Very sorry Tommy will be away from Santa Barbara this week end and thus prevent

my visit with him as I had planned Stop Therefore I plan to visit with him in Santa Barbara next week end. Expect to arrive August fifth.'' A service message reported to respondent that his wire of the 29th was undelivered because addressee was out of the city for a week.

April 27, 1950, respondent wired appellant: "Plan to visit Tommy week end of May 5th. Expect to arrive afternoon May 5th'' to which appellant replied on the 28th by letter "Tommy will not be available May 5th. You may visit with him on May 6th and 7th.''

Other messages appear presently.

*The 1948 Easter vacation incident:*

The order of September 16, 1947, provided that "Defendant shall be permitted to have the said minor child with him in his own home at San Francisco . . . for the Easter vacation week in the year 1948. . . .''

On March 22, 1948, respondent wired appellant: "As per our understanding four weeks ago I expect to arrive Wednesday March 24th to take Tommy for his Easter vacation'' to which there was no response.

Accompanied by his sister and Mrs. Kirksey, a family friend, respondent drove to Santa Barbara. The two ladies were to return to San Francisco by train on the "Daylight'' and respondent drove them directly to the railroad depot at Santa Barbara. There he found appellant and Tommy, prepared to take the train to San Francisco. Respondent testified that appellant asked "What are you doing here?'' and he replied "I came to get Tommy for the Easter vacation.'' Respondent had a copy of the court order in his pocket and when he produced it appellant turned the boy over to him and he drove back to San Francisco with Tommy while appellant went to San Francisco on the train. Respondent testified that he had had no prior advice of appellant's intentions.

Appellant's testimony respecting this episode was that she had not received the order and had wired her then attorney (not her present counsel) and had received no reply. She then determined to go to San Francisco to see Judge Meikle and was at the depot when she met respondent. She admitted that she had assumed respondent might be coming to Santa Barbara because "That was the date of . . . that vacation; that was at the beginning of it." Further, "Q. You anticipated then, too, that the doctor was coming down to get the boy for the school vacation? A. I knew that was the day

of the vacation and the beginning of the order, but I had not received the order. . . . Q. So knowing that the doctor was to have the boy you decided to come to San Francisco without telling anyone about it except the lawyers? A. The lawyers didn't even know I was coming. I was bringing up Tommy to Judge Meikle.''

*The 1949 Christmas episode:*

The order of September 16, 1947, which provided that appellant should have the boy for Christmas of 1947 and 1948, and Easter of 1949, also provided that defendant should have him ''in his own home at San Francisco . . . for the Christmas vacation period in the year 1949.''

On December 8, 1949, respondent wired appellant: ''I have planned to come for Tommy on December 16th to take him for his 1949 Christmas vacation. Expect to arrive Friday afternoon December 16th. Please telegraph collect that he will be ready.'' There was no reply.

On the day when this telegram was sent respondent served and filed a notice of motion which was set for hearing on December 13. The motion sought an order directing plaintiff to comply with the final decree and all modifications thereof, particularly the order of September 16, 1947. Respondent's affidavit in support of the motion alleged that plaintiff had ''in defiance of said order of court made and entered on the 16th day of September, 1947, on many occasions not permitted defendant to visit with his said minor child at or near Santa Barbara, California, either on weekends or at any other reasonable time. Affiant is informed and believes that plaintiff, in defiance and disobedience of said order of court, will not permit defendant to have his said minor child with him for the Christmas vacation period this year as provided for in said order of court.

''Said Christmas vacation period in the year 1949 begins on the 16th day of December, 1949, and affiant prays that this Court issue its order directing the plaintiff above named to deliver up to affiant his said minor child at Santa Barbara, California, on the 16th day of December, 1949, so that affiant may have his said minor child with him for the Christmas vacation period this year, as·provided for in said order of court.''

A copy of the notice and of respondent's affidavit was served on appellant by mail and upon her attorneys personally. On December 13, 1949, the motion came before Judge Molkenbuhr, who found that there had been due

service of the notice and affidavit. An order was then made reciting that no appearance had been made on behalf of the plaintiff and directing that "plaintiff . . . pursuant to the terms of the order made and filed herein on September 16, 1947, permit defendant . . . to have said minor child . . . with him for the vacation period in the year 1949"; and further "that the said vacation period is hereby fixed as commencing on December 16, 1949, and ending on January 1, 1950; and said plaintiff . . . is hereby ordered to deliver the said minor child of the parties to defendant on December 16, 1949 for the said vacation period."

With respect to respondent's wire to appellant dated December 8, the Western Union on December 16 wired respondent: "Santa Barbara advises Mrs. Cornwall out of city. Left Sunday. Return date unknown. They are unable to advise or confirm delivery."·

Before school had closed appellant took Tommy to Pasadena and did not return to Santa Barbara until after the Rose Bowl game parade. On cross-examination appellant was asked "You knew under the existing court order that the doctor could have this lad for Christmas vacation in 1949, commencing the 16th of December 1949?" and answered "Yes. That's what we tried to have modified, and which precipitated all this action." Appellant testified further: "Q. So, did you tell the doctor by phone, letter, or word of mouth, that you were going to take Tommy out of school prior to the vacation starting on December 16th? A. No, I didn't. . . ." "Q. Did that courtesy go to the extent of advising the doctor where the boy is when he is away from Santa Barbara, or whether he is sick? A. Well, in divorces you sacrifice something; that's all. . . . Q. Of course, the doctor didn't know where you were? A. Your detectives were looking for us, too. Q. Did anybody know where you were? A. No. Q. Your parents knew where you were? A. Yes."

Appellant testified that on her return to Santa Barbara her mother told her she had talked with respondent and had told him that appellant was not in Santa Barbara.

On January 25, 1950, an affidavit was filed by respondent referring to the order of September 16, 1947, and alleging several instances where he claimed appellant had defied and violated the court's orders. It alleged the matters just discussed; the telegram of December 8 reminding appellant of the court order dealing with the Christmas vacation; the motion and order of December 13; the mailing of the order

to appellant; a telephone call by respondent to appellant's residence on December 16 and the answer therefrom that neither appellant nor Tommy was in Santa Barbara but that they had left during the early part of that week and that Tommy had been taken out of school before the vacation began; "that the plaintiff had not said where she was going with said minor child, or what her address would be" and that "Defendant has received no word or information from plaintiff since said telephone to her residence as to the whereabouts of said minor child or as to the reason for withdrawing him from school prior to the commencement of the vacation period or as to where the said minor child spent his Christmas vacation for 1949. Affiant alleges that plaintiff, with a determined intention of depriving the defendant of the pleasure of the company and association with his said minor child, and in disobedience and defiance of the orders of this court, deliberately took the said minor child, or hid the said minor child and herself, in a place or places unknown to this defendant."

The affidavit contained other allegations of claimed violations and concluded with the prayer "that this court make such appropriate order or orders as will compel the plaintiff to respect and to comply with the orders of the above entitled court concerning the defendant's right of visitation with and custody of his said minor child."

An order was issued by the Presiding Judge on January 25, 1950, requiring appellant to appear on February 9, 1950, and show cause why she should not be punished for contempt of court for failing to comply with the order of September 16, 1947, concerning the right of the defendant to have the boy during the Christmas vacation period of 1949. It was served by the Sheriff of Santa Barbara County on January 28.

Appellant did not appear at the time and place fixed nor was she represented by counsel. On February 16 a warrant of attachment was issued directing that she be brought before the court on February 21, and fixing bail. Plaintiff was arrested by the Sheriff of Santa Barbara County on February 20, and released on bail.

She was subsequently found guilty of contempt of court, and sentenced to 60 days in the county jail with the sentence suspended.

The present proceedings followed.

The lengthy record contains testimony with respect to disputes as to other vacation trips, including one instance

where the court permitted respondent to have the boy for an additional period during one summer vacation so as to make up for time the year previous when he could not get him. It contains, also, testimony which is in sharp conflict (a) as to what the parties are claimed to have said in the presence of the boy, in one instance—at the Santa Barbara depot— when respondent claims appellant called him a liar in the presence of the boy and of other persons; (b) as to the conduct and behavior of the boy—one group of witnesses testifying that it was excellent, or at least normal for a boy, the other that it showed a lack of training and discipline in manners and deportment, and (c) with respect to the boy's health, and the climate of Santa Barbara. We see no reason to narrate all this evidence since such conflicts were for the trial court to resolve.

Appellant states the question for decision as follows: "Did the trial Court abuse its discretion in taking custody of an eight-year old child away from its mother and awarding such custody to the father, in the face of uncontradicted evidence showing that the child was progressing, both physically and intellectually, in a perfectly proper home; and without either evidence or claim of evidence, that the mother was not a perfectly fit and responsible person?"

The question for decision as we see it is simply whether, in the light of all the evidence, both uncontradicted and contradicted, the court abused its discretion in making the order appealed from.

Appellant in her brief concedes "the familiar rule which holds that every intendment must be resolved in favor of the validity of the judgment under assault." Therein counsel also says: "In the resolution of problems of this kind, it is redundant to remark that 'each case must be decided upon its own particular facts.' Similarly, one who embarks upon an appeal of this kind faces the immediate proposition that the appellate court must sustain the court's ruling unless the record itself shows an abuse of discretion which is shocking to the reviewing court's conscience."

In *Prouty* v. *Prouty*, 16 Cal.2d 190, 191 [105 P.2d 295] the court said: "It is the settled rule that, in determining who should have the custody of the minor children of the parties to divorce actions, a very broad discretion is vested in the trial courts. It is only when a clear case of abuse of said discretion is made out that this court will interfere with the determination of the trial court on appeal [citations]."

It has been held that "a wider discretion is afforded the courts in dealing with matters pertaining to children than in many other cases" (*Taber* v. *Taber*, 209 Cal. 755, 757 [290 P. 36], quoting *In re Johnson*, 101 Cal.App. 110 [281 P. 435].)

The uncontroverted evidence, which we have summarized at some length, is unquestionably sufficient to sustain the order and to show that there was no abuse of discretion. With respect to the evidence which was controverted appellant in her brief recognizes "the rule which makes decisions upon conflicting issues of fact impregnable on appeal."

Moreover, as in other cases, it has been pointed out in cases of this kind that the trial judge "had the benefit of personally seeing and hearing all the parties to the controversy" (*Kelly* v. *Kelly*, 75 Cal.App.2d 408, 414 [171 P.2d 95]; see, also, *Prouty* v. *Prouty*, *supra*, 16 Cal.2d 190, 195).

Certain well settled rules control the trial court's determination of cases such as this.

"In awarding the custody the court is to be guided by the following considerations: (1) By what appears to be for the best interest of the child in respect to its temporal and its mental and moral welfare; and if the child is of a sufficient age to form an intelligent preference, the court may consider that preference in determining the question; (2) As between parents adversely claiming the custody, neither parent is entitled to it as of right; but other things being equal, if the child is of tender years, it should be given to the mother; if it is of an age to require education and preparation for labor and business, then to the father." (Civ. Code, § 138.)

■ "Of course, the paramount interest of the court is the welfare of the child" (*Prouty* v. *Prouty*, *supra*, 16 Cal.2d 190, 195). "The question is to be determined solely from the standpoint of the child, and the feelings and desires of the contesting parties are not to be considered, except in so far as they affect the best interests of the child." (*Taber* v. *Taber*, *supra*, 209 Cal. 755, 756-7.)

When the hearing was well along, and while a psychiatrist called by respondent was under examination, the judge said: "There is a lot of bickering back and forth between these people and the child is aware of that. Let's not argue that fact. We know that." Addressing the same witness he added: "Q. If I interpret your testimony here today, Doctor, it is in so far as these court hearings are concerned and the child being aware of the goings on and the disputes over his custody, what should be done, how much time he should spend

with the mother and father, and the situation there, that you feel by reason of him knowing that alone it is a very unsatisfactory situation so far as he is concerned, and is damaging his mental health, is that right? A. Definitely. . . . It is impossible to keep a child in ignorance of anything of this sort.''

The record shows that the boy was not only fully aware of the repeated and continuing disputes between his parents but was disturbed by them. The practical question before the trial court was whether there was a better probability that these disputes and difficulties would be minimized, and their recurrence reduced, by continuing the physical custody with the mother, or changing it to the father. That was the court's paramount consideration and in deciding that question the court had to weigh and compare the conduct of both the parties over a six-year period.

Moreover it is to be presumed that in deciding the question as he did the trial judge gave weight to the respondent's definite commitment to place Tommy in a boarding school. At the close of respondent's case in chief the following assurance was given: ''Q. Doctor, you are asking for the entire custody of Tommy now, with the privilege of this mother, of course, to see him at all reasonable times, as indicated by the Court. What is your intention, should such an order be made by the Court, what is your intention to do with the boy in reference to his schooling? A. Well, my plan is to put him in a boy's boarding school that might be chosen by the Court, and to see that he has all the advantages of a growing and developing child, with proper training and discipline. Q. Some place in the Bay area? A. Yes—or whatever the Court might choose.''

This was followed up toward the close of the hearing when respondent's counsel asked: ''Doctor, have you inquired into the availability of a private school in this part of the state that would be suitable for Tommy's attendance and care?'' and respondent answered ''Yes.'' The court then remarked: ''As I recall it the doctor's proposition was were he to be given the custody, or a change made in the custody, the boy would be placed in some private school in this part of the country which would be approved by the Court.''

The trial judge undoubtedly had that in mind when he decided the case.

Appellant contends that the court abused its discretion ''because there is no actual conformity between the pleadings

in the case and the proof adduced.'' Under this head counsel points to respondent's affidavit in support of the motion, and argues that ''the *affidavit* of the moving party substitutes for the function of a *complaint* in the ordinary civil action.'' No authority is cited in support of this claim.

The notice stated that the motion would be ''based on this notice of motion and upon the affidavit of said defendant, a copy of which is served and filed herewith, and upon all of the papers, pleadings, records and files herein, *and upon oral and documentary evidence to be adduced at the hearing of this motion.*'' (Italics added.)

The hearing consumed seven afternoon court sessions and, as appellant says, all the earlier proceedings were incorporated into the record. No ruling on the admission or rejection of evidence is now urged as error. The 331-page transcript contains comparatively few objections. *No objection was made that the inquiry was getting out of bounds or going beyond the issues tendered by the moving parties.* It is evident that both sides treated the hearing as taking in and embracing the whole field of controversy. There is no merit in this point.

The point is also made that ''No 'change of conditions' was shown within the intendments of applicable California cases.'' ■ In the first place the so-called ''change of conditions rule'' is not at all ''iron-clad'' (*Foster* v. *Foster,* 8 Cal.2d 719, 728 [68 P.2d 719]; *Kelly* v. *Kelly,* 75 Cal.App.2d 408, 415 [171 P.2d 95]). ■ Secondly, change of conditions is an elastic phrase which cannot be said to be limited to such matters, for example, as the living conditions, household surroundings, family relations, schooling, or the recreation of a child. ■ Thirdly, if the child's welfare is paramount then the change of conditions rule must be only subsidiary to the main consideration.

■ Appellant's last point is that the court erred in failing to make written findings of fact and conclusions of law as requested. It is settled that in cases such as this, findings are not required (*Crater* v. *Crater,* 135 Cal. 633, 635 [67 P. 1049]; *Simmons* v. *Simmons,* 22 Cal.App. 448, 456 [134 P. 791]; *Gavel* v. *Gavel,* 123 Cal.App. 589, 591 [11 P.2d 654]; *Booth* v. *Booth,* 69 Cal.App.2d 496, 499 [159 P.2d 93]; *Smith* v. *Smith,* 85 Cal.App.2d 428, 433 [193 P.2d 56]).

With respect to the custody cases cited by both sides, it is sufficient to say again that the circumstances of every custody case differ; only rarely is a parallel set of facts to be found. We have summarized earlier, in considerable detail,

the salient facts and incidents which, in our opinion, are clearly sufficient to sustain the order. Nothing will be gained by a discussion of authorities dealing with altogether different factual situations.

The order is affirmed.

Nourse, P. J., concurred.

A petition for a rehearing was denied January 9, 1952, and appellant's petition for a hearing by the Supreme Court was denied February 7, 1952.