[Civ. No. 11046. Third Dist. Oct. 7, 1965.]

RODGER HAROLD DAHL, Plaintiff and Respondent, v. MARILYN ROSE DAHL, Defendant and Appellant.

John Kappos for Defendant and Appellant.

Charles A. Zeller, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant wife ("Mrs. Dahl") has appealed from a change of custody order awarding plaintiff husband ("Dahl") custody of Raymond, the child of the couple born in January 1962. When, on October 9, 1963, an interlocutory decree of divorce had been granted Dahl, custody of this child was, by consent, awarded to Mrs. Dahl. The order appealed from followed a motion by Dahl filed March 10, 1964.

Contentions of Mrs. Dahl on this appeal are that the evidence before the court on the hearing of the motion was insuf-

ficient to justify the order because (1) there had been no change of circumstances after the entry of the interlocutory decree, (2) there was no showing the best interests of the child would be served by the award of custody to Dahl, and (3) the court erred in not giving Mrs. Dahl an opportunity to cross-examine the probation officer after receipt by the court of that officer's report and in not granting her request to present further evidence answering charges therein contained.

The first two contentions must be rejected. The third contention is sound but because of the nature of these proceedings and the somewhat peculiar circumstances existing, including elapsed time (all to be explained below) we conclude that the error does not justify a reversal.

Dahl's motion was heard March 26, 1964. It showed that at the time of the divorce and for some time theretofore Mrs. Dahl had been having sexual relations with one Iwao Wakai, an Oriental. Dahl is a police officer of the Lodi Police Department; Wakai is a police clerk in the same department. Divorce proceedings had no doubt been precipitated by the birth of another child, Delaura, whose Oriental features were proof to the satisfaction of the parties, if not the law, that Wakai and not Dahl was the father. Both Mrs. Dahl and Wakai admitted this parenthood. The relationship between the two continued openly and uninterruptedly after the divorce and up to the date of the hearing of Dahl's motion. Although Wakai did not reside at Mrs. Dahl's one-bedroom house, he was a daily and continuous "visitor." The children, Raymond and Delaura, occupied the bedroom. Mrs. Dahl and presumably Wakai, during their dalliances, used a couch in the living room. Asked if the sexual relations occurred during "the continuous period of his visitations there in the home," Mrs. Dahl replied, "I don't keep track." She denied that Raymond had witnessed her and Wakai's activities. Wakai corroborated this but admitted that he was a daily visitor, that his and Mrs. Dahl's indulgences "possibly" took place frequently in the early evening hours. Whether the children were then awake he did not know.

Mrs. Dahl and her witnesses testified that she was a loving mother who took good care of both children. They were well fed and kept neat and clean. She was a good housekeeper. She provided a respectable and capable babysitter during the day when she was, of necessity, at work.

Dahl explained his original consent that his wife have custody of the child: He at that time had no home for the

child or ability to make one. He had realized that Mrs. Dahl loved and was good to the child. He had warned his wife, however, that "if the environment was such that I felt was not good for my son that I would want custody of him." His reason for seeking a change of custody was the conditions in the home already described and he had (belatedly) realized the problems the child would have in being raised with an Oriental half-sister who was the illegitimate child of his former wife and Wakai.

To make the change-over feasible, he had rented a three-bedroom house and had retained the services of a couple in their sixties, a Mr. and Mrs. Robertson, who had raised eight children of their own and who would take good care of the child. They were well known to Raymond who had frequently visited them in their home. Although Mr. Robertson had had to retire for a disability, this would not interfere with the couple's ability to care for Raymond.

During the taking of testimony the court suggested the desirability of an investigation and report by the probation officer. Dahl's counsel readily agreed to this. Defendant's counsel stated: "May we agree to that subject to the right to being heard on the matter? THE COURT: If you feel the Probation Report is not complete—you may view it, if you are not satisfied you may ask that a further hearing be had."

Defendant's counsel then conferred with his client and afterwards requested and received permission to produce her witnesses who were then present. These witnesses gave testimony which included admissions by Dahl made at the time of the divorce that he was not then ready to settle down and assume custody of Raymond. The hearing was then recessed.

The report of the probation officer was filed May 13, 1964. It reveals a detailed investigation, including an account of interviews with the parties and a number of witnesses. Among such witnesses were the Robertsons, the couple who, if an order of custody change were made, would care for Raymond during Dahl's working hours. The report, corroborating Dahl's testimony showed the Robertsons to be well qualified.

The report was highly critical of Mrs. Dahl's stability and discounted any possibility of her rehabilitation. She had told the probation officer she did not know if there would ever be any marriage between Wakai and herself, although she expressed a hope for one. Although much of the matter contained in the report was merely corroborative of the testimony already received at the hearing and added very little thereto, there was some innuendo, and recitals of some of the inter-

views were in the form of conclusions; e.g., "The testimony of their former neighbors would indicate that Mr. Wakai was not alone in the discovery of Defendant as a woman in need of something more than marriage could offer." There were veiled comments; e.g., ". . . Defendant has made unexplained remarks which would indicate that she had previously borne children. . . . The surveillance by her former husband, David Popovich, . . . appears now to have had significant bearing." The conclusion is reached: ". . . It does not appear that Defendant's need for sexual experience is diminished and it is presumed that she will fulfill her paramount need in the future regardless of her circumstances without some professional help." The probation officer recommended that Dahl be granted custody.

On May 19, 1964, Mrs. Dahl's counsel wrote to the judge. A copy was mailed to Dahl's attorney. The letter states:

"On going over the Probation Report with my client, there are contentions made by her and some of her witnesses to the effect that certain things of material importance stated to the Probation Officer have been omitted and that other things have been misinterpreted.

"Further, it appears that the Probation Report has attempted to relitigate the entire divorce which legally the plaintiff should be prevented from doing. Not only this, but the report even goes further into an attempt to use speculation, opinion and conclusions of certain witnesses as to what might have happened with Mr. Popovich. The myriad of hearsay and speculation and opinion makes it very difficult to defend and I would request a further hearing so that certain matters in the report might be straightened out under proper rules of evidence and court procedure."

There is no indication in the record that the judge ever acknowledged or replied to this letter. On the other hand, no formal motion nor further request for a hearing was made. None was had.

On June 9, 1964, the court filed the order appealed from. Referring to the probation officer's report the court states "the same has been read and considered. . . ." The court finds that Mrs. Dahl "is not a fit and proper person to have the care, custody and control of said minor child. . . ." It finds that Dahl is, and custody is awarded to him.

■ Regarding Mrs. Dahl's first two contentions: there is no inflexible rule that no change of child custody can be ordered unless there has been a change of circumstances after

the entry of the original custody order. The paramount concern of the court is the best interests of the child. (*Foster* v. *Foster* (1937) 8 Cal.2d 719, 728 [68 P.2d 719]; *Cornwall* v. *Cornwall* (1951) 108 Cal.App.2d 95, 110 [238 P.2d 8].)

Moreover, here there *was* substantial evidence of changed circumstances, including a defiant maintenance by defendant of living conditions in which a child, rapidly leaving babyhood, was being continuously exposed to almost inevitable discovery of his mother's improbity. Raymond was being raised in an environment certain to result in the ostracism of both the mother and the children by their more respectable and conventional neighbors. Another change of circumstances was the father's ability, nonexistent at the time of the divorce, to provide a suitable home where the child would receive loving care in a normal environment.

The contention that there was no substantial evidence to prove that Mrs. Dahl was not, and Dahl was, a fit and proper person to have custody of the child is meritless. This is not the case of a mother's maintenance of a meritricious relationship carefully guarded from her children. It is an open and notorious bringing of a paramour into the home under circumstances defying accepted social concepts. The weighing of this against the obvious advantages to a child of tender years of having the loving care of a natural mother (see Civ. Code, § 138), even an imperfect one, was for the trial court's determination. (*Mathewson* v. *Mathewson* (1962) 207 Cal.App.2d 532 [24 Cal.Rptr. 466].)

As stated above, appellant's third contention—that the court erred in ruling without affording her an opportunity to be heard, as requested, on the probation officer's report—must be sustained.

Statutory authority for reports of probation officers in matters involving the custody of minors is in Welfare and Institutions Code, section 582. (*Forslund* v. *Forslund* (1964) 225 Cal.App.2d 476, 494 [37 Cal.Rptr. 489].) The section provides: "The probation officer shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters. The court is authorized to receive and consider the reports and recommendations of the probation officer in determining any such matter."

The investigation and report provided in that section has been treated as having status similar to that of the domestic

relations case investigators authorized in certain counties by Code of Civil Procedure section 263. (*Forslund* v. *Forslund, supra,* 225 Cal.App.2d at pp. 494-495.) Unlike the report provided for under section 263, which is only admissible in evidence upon stipulation,[1] section 582 states that the investigation and report shall be made upon order of court and contains no requirement for the parties' consent. (Here, however, consent was given.) It also provides: "The court is authorized to receive and consider the reports and recommendations of the probation officer in determining any such matter." This is tantamount to a statement that the report shall be received in evidence. (*Forslund* v. *Forslund, supra,* at pp. 494-495.)

The proper function and limits of the investigation and report are set forth in *Fewel* v. *Fewel* (1943) 23 Cal.2d 431 [144 P.2d 592], where the court interpreted Code of Civil Procedure section 263. There the Supreme Court (per Justice Schauer) points out (on p. 435) that the power granted to the investigator is not a judicial power but merely auxiliary to that power. It is said, however, to be an important adjunct "of that particular part of [the court's] judicial business which deals most intimately with the welfare of children of broken homes," since the investigators will be able to obtain and produce evidence which the judge might otherwise be unable to obtain (at least not expeditiously). The court says (on p. 435): ". . . They may see the homes in which the children live, they may call without previous notice of the exact time, they may observe whether children appear to be supervised or neglected, nourished or famished, happy or abused."

 Counsel for Mrs. Dahl complains that the report contains hearsay which was inadmissible. Of course, the report contains hearsay. In fact it *is* hearsay. But it is hearsay authorized by the Legislature and is therefore an exception to the rule excluding hearsay. (5 Wigmore, Evidence (3d ed.) § 1672, p. 694.) The fact that the report, although hearsay, is admissible, does not, however, give to the court carte blanche to accept it in lieu of all other evidence. Nor does it leave the parties helpless to challenge the contents of the report. As is stated in *Fewel* v. *Fewel, supra,* 23 Cal.2d

---

[1]Code of Civil Procedure section 263 provides in part: "The report of the investigators shall be admitted in evidence upon the stipulation of both parties, and shall be competent evidence as to all matters contained therein."

at page 434: "The purpose of the legislation . . . is obviously what the language used implies; i.e., to *assist* the court and not to *replace* it. The Legislature would have no power to substitute an investigator for a judge. Neither does such legislation authorize a trial court to deny to the parties any of the usual attributes of a fair trial in open court upon due notice." The court also states (on p. 436): ". . . The reports of the investigators should be presented in affidavit form, or otherwise under oath, and an investigator, upon timely demand by any party, must appear like any other witness and testify subject to the rules of evidence and the right of cross-examination."

Although Welfare and Institutions Code section 582 is less explicit in its terms than Code of Civil Procedure section 263, the fundamental requirements of procedural due process must nevertheless be considered as included in the former by necessary implication. Here the reception and use of the report by the court, also the court's denial to Mrs. Dahl of any opportunity to challenge it, failed to meet these requirements. First, the report was neither under oath nor verified. (*Forslund* v. *Forslund, supra,* 225 Cal.App.2d at p. 495.) Secondly, the right of Mrs. Dahl to be heard after the probation officer's report had been filed and to cross-examine that officer regarding that report, rights which are inherent and fundamental, were violated. The trial court had seemingly conceded these rights and had agreed to hold a further hearing, as evidenced by the judge's statement quoted above. Counsel's letter to the judge, also quoted above—while not to be recommended as a substitute for a formally noticed motion—nevertheless, brought to the court's attention the fact that Mrs. Dahl desired to avail herself of the promised hearing challenging the report. The order shows on its face that the court in making its ruling had considered the report.

Although we believe the court's failure to act upon the letter from Mrs. Dahl's attorney, admittedly received, must have been inadvertent, we must and do find that the making of the order without granting the requested hearing was error. It was not, however, an order made without jurisdiction. (*Fewel* v. *Fewel, supra,* 23 Cal.2d at p. 437.)

Ordinarily it would be axiomatic that error denying a litigant a fair trial or hearing would have to be considered prejudicial per se. Here, however, there are peculiar circumstances requiring us to look more closely at the meaning of the term "fair hearing" as applicable to a child custody case and—more particularly—to *this* child custody case. Here, the

order appealed from was made June 9, 1964. The appeal has, in the normal course of events, taken more than a year to reach us for decision. The execution of the order appealed from was (quite properly) not stayed and the child whose welfare is the ''paramount concern'' of the court has during this long period presumably been making adjustment to a new home and environment.[2] During all of this period the superior court in this very proceeding has had continuing jurisdiction to hear, consider and determine, motions for custody changes. (Civ. Code, § 138.) Motions for modification of child custody can be made at any time and when made will be decided on the basis of conditions existing *at the time of the hearing.* (*Munson* v. *Munson,* 27 Cal.2d 659 [166 P.2d 268].)

How then can the best interests of this child be served now by a rehearing, the sole motivating purpose of which would be to permit a rehash of a report which by the time of such rehearing would be nearly two years old? If we were to reverse, the court, regardless of its findings regarding the old report, would still be obligated to ascertain which parent should have custody based upon the child's best interests as of the time of such new hearing. And since at the prior hearing Mrs. Dahl, by her own admissions, was shown to be an unrehabilitated and unrepentant woman, the burden would inevitably be hers (1) to prove herself both a fit and proper person presently; and (2) to establish that it would be to the best interests of the child to remove him from his present home and environment and subject him to another readjustment. Presumably a new probation report would be required as an aid to the court in making that determination. That report and not the one made in 1964 should be the one to be tested. All of these things can be better determined by a new motion,

---

[2] Such delays are deplorable. Our appellate procedure creaks. It is infrequent that the answer to the problem of delay lies in our exercise of the power to issue one of the extraordinary writs. Reviewing courts will not lightly peremptorily ''second guess'' a superior court's custody order. As regards many child welfare cases the procedural system is blameworthy. We suggest, however, that under the facts of the case at bench relief through recourse to an extraordinary writ *was* possible. An order was made in which a fundamental right had been violated. A motion to vacate made to the superior court and addressed solely to the constitutional question might have brought to the court realization of its error. Had the motion been denied a clearcut issue by petition for a writ of mandate could have been made. With the welfare of a child involved the issuance of such a writ would not seem to be a stretching of an appellate court's prerogative to the breaking point. (See *Blue* v. *Superior Court,* 147 Cal.App.2d 278, 286 [305 P.2d 209]; *Vest* v. *Superior Court,* 140 Cal.App.2d 91, 96 [294 P.2d 988].)

leaving the court unfettered by the necessity of a time-wasting reexamination of a no-longer-relevant report. The forecast of a new hearing assumes, of course, that Mrs. Dahl considers herself now to be in a position to meet the quite demanding conditions which must be met before she can properly seek restoration of custody. If she cannot *now* meet them, the parties should ''let the sleeping dog lie,'' but we say again it will serve no useful purpose to hold a moot court hearing to determine how much, if any, credence the court should have given to a report no longer significant. That would be like relitigating the divorce. No concern by this court for the tampering with Mrs. Dahl's rights can supersede our concern for the welfare of this child who must not, if it can be prevented, become a football in a game of rules. We must not compound the harm caused by the law's delay.

An injustice was done Mrs. Dahl. A greater injustice would be done by granting her prayer. Therefore we deny it and find no miscarriage of justice in so ruling. (Cal. Const., art. VI, § 4½.)

The order is affirmed. In the interests of justice, appellant shall recover her costs.

Friedman, J., and Regan, J., concurred.