[Civ. No. 6626.   Fourth Dist.   Feb. 8, 1962.]

DIXIE K. GRUBAUGH, Plaintiff and Appellant, v. JERRY GRUBAUGH, JR., Defendant and Respondent.

Nichols & Hodge and Christopher Hall for Plaintiff and Appellant.

Spiegel, Lincoff & Wolfson for Defendant and Respondent.

GRIFFIN, P. J.—This is an appeal by the mother of two minor children, aged 1 and 3 years in 1958, from an order of court changing the custody of the children from plaintiff-

appellant mother to defendant-respondent father. The marriage of the parties was annulled on December 17, 1958 (on account of claimed bigamy of father) and the custody of the children was awarded to plaintiff. A property settlement agreement of the parties was incorporated in the decree and the parties were ordered to carry out its executory provisions. The plaintiff was awarded $300 per month for the support of herself and the two minor children. On February 17, 1960, defendant initiated a proceeding to change the custody of the children. The hearing was held on May 19, 1960. The court made an order awarding custody to defendant, with the right of plaintiff to reasonable visitation, provided that such visitation be in the absence of any gentlemen.

Defendant was a flight engineer employed by United Airlines. He lived with his sister, her husband and their little boy in a three-bedroom residence with two bathrooms. His two girls, when with defendant, had a separate bedroom.

Material facts, developed are that in October 1958, prior to the annulment, plaintiff became acquainted with a paramour, which relationship continued until March 1959. During this period, the paramour spent the entire night with her and on an average of once a week he had sexual relations with her. On two occasions the children were present in his apartment and stayed in the living room while plaintiff and the paramour occupied the bedroom. The paramour loaned her about $300 during this period, which loan was never repaid. During the latter part of this period, plaintiff, on occasions, stayed out all night and defendant acted as babysitter for the children at her apartment. He had been visiting the children at least once each week.

In April 1959, plaintiff met another paramour, a married man, in a café and bar and had sexual relations with him in her apartment about twice each week for some period of time. About 4 a. m. on one occasion, the paramour's wife and several policemen entered plaintiff's apartment. The paramour was half-dressed and whisky bottles were on the sink. The children were in another room.

At another time, a friend of plaintiff stated to plaintiff that she should give the custody of the children to defendant and plaintiff replied that he could have custody if he would continue paying her $300 per month. The evidence showed that plaintiff requested permission of defendant to take the children to Colorado and defendant told her the agreement

and court order forbade it without the written consent of defendant. She took them without consent and they were gone for over two months. After defendant employed an attorney to compel their return they were brought back.

In November 1959, plaintiff met a third paramour, a married man, in a bar called the "Epicure." On occasions, when the defendant had the children with him for visitation, plaintiff called defendant and had him bring the children to her at the bar and, on arrival, plaintiff was drinking with the third paramour. Plaintiff occupied an apartment with her two children. The third paramour moved in with her and plaintiff admitted having sexual relations with him and said that the children were in the apartment, but "not all the time." The paramour was giving her about $150 per month and at Christmas time he gave her additional money to buy Christmas presents for the girls. Plaintiff testified that she intended marrying him when he divorced his present wife. Apparently plaintiff and this man had a fight and on one occasion she bore bruise marks from his striking her. The children were present. The youngest child became hysterical and the man locked the children in the bedroom. Some time later plaintiff telephoned a neighbor and said that the night before she was depressed, turned on the gas in her apartment and some friends dragged her outside. Plaintiff testified that she was intoxicated at the time she tried to kill herself.

On January 25, 1960, plaintiff telephoned defendant and asked him to come and get the children because she had been beaten up. Defendant went there with the police. The third paramour was there and both had been drinking. Defendant stated that the youngest child had become hysterical from watching the beating. The children were very nervous and upset and defendant took them home with him.

A neighbor testified that in her opinion plaintiff did not take good care of the children; that she had not fed them when they were hungry and they had to eat crackers; and that on several occasions they had not had breakfast until noon and their mother was still in bed. Defendant corroborated this testimony and said that the youngest child had nightmares and was afraid to be left alone.

Plaintiff admitted cashing support checks in various bars, having defendant leave the children with her at the bars, and using violent language in the presence of the children. She admitted that since the order to show cause was served in this proceeding, she refused allowing visitations by defendant with

the children. During this period plaintiff lived in five separate apartments or homes with the children.

It is plaintiff's argument on this appeal, after reciting the general rules in reference to custody of children of tender years and girls, that custody should be given to the mother (Civ. Code, § 138; *Morgan* v. *Morgan,* 139 Cal.App.2d 704 [294 P.2d 45]); that changing custody of children should be avoided (citing *Morgan* v. *Morgan, supra*); and that the best interests of the children should be considered. (Citing *Newell* v. *Newell,* 146 Cal.App.2d 166 [303 P.2d 839].)

She relies on the principles stated in *Foster* v. *Foster,* 8 Cal.2d 719, 726 [68 P.2d 719], to the effect that until a *change of circumstances* arises after the former order of custody, the court should not modify or change the former order and that the burden is on the moving party to show change of circumstances. ▌▐ The rule that a change in circumstances must be shown before a court will modify a decree awarding custody is not so unyielding as not to admit of exceptions. (*Edwards* v. *Palleschi,* 167 Cal.App.2d 555 [334 P.2d 671]; *Foster* v. *Foster, supra; Kelly* v. *Kelly,* 75 Cal.App.2d 408, 415 [171 P.2d 95].)

Plaintiff relies strongly on the case of *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211 [286 P.2d 983], as being similar in factual background and controlling here. There, the court held that the custody of five children under 7 years of age should remain with the mother, notwithstanding a finding of the trial court to the contrary, where the only evidence against her pertained to her activities with one other man who lived with her after the interlocutory decree and who was the father of the fifth child and who intended to marry her when his divorce decree was final. The upper court also considered the inability of the children's father to care for them. He was in the army and intended to remove the children to Virginia for rearing by his grandparents. The court said that in view of the youth of the children, the conduct of the mother could have "no possible bad effect upon them."

While we do not, in the absence of other circumstances, fully subscribe to this last conclusion, the appellate court, in reversing the judgment, emphasized the lack of ability of the father to adequately and properly care for the children. That case is not necessarily determinative of the issues here presented because of the facts related. ▐ We are not here confronted with a situation of one immoral act, but with a continuous course of unmoral, if not immoral, conduct. ▌▐ To

be entrusted with the rearing of children, a mother should be possessed of such character and conduct that by the force of her example she can train them in the paths of morality, righteousness and rectitude. (*Currin* v. *Currin,* 125 Cal. App.2d 644 [271 P.2d 61].)

In determining the comparative ability of the parties to adequately care for the children, the court has a wide discretion. The primary consideration is what will promote the best interests of the children. (*Goto* v. *Goto,* 52 Cal.2d 118, 123 [338 P.2d 450].) In *Reynolds* v. *Reynolds,* 149 Cal.App. 2d 409, 413-414 [308 P.2d 921], it is said that:

"Fitness to have the custody of a minor child requires more than affection and the ability to properly feed, clothe and house the child. It also requires an environment which will not be detrimental to the character and morals of the child."

A mere recitation of the facts shows grounds for the trial court to find that the character and demeanor of plaintiff would be adverse to a proper raising of children under these circumstances. (*Santens* v. *Santens,* 180 Cal.App.2d 809, 819 [4 Cal.Rptr. 635]; *Taylor* v. *Taylor,* 150 Cal.App.2d 104 [309 P.2d 508].) We perceive no abuse of discretion in so holding. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].)

Order affirmed.

Shepard, J., and Coughlin, J., concurred.