[Civ. No. 32105. Second Dist., Div. One. May 6, 1968.]

LAURA JUNE NELSON, Plaintiff and Respondent, v. ALLAN LEROY NELSON, Defendant and Appellant.

§ 288 (6).

Louis P. Friedman and Bertram L. Linz for Defendant and Appellant.

Millikan, Montgomery, Franciscus & Olafson and Edward R. P. Montgomery for Plaintiff and Respondent.

FOURT, J.—Allan LeRoy Nelson appeals from that order of the court denying modification of the child custody provisions of the interlocutory judgment of divorce which he obtained in 1965 from Laura June Nelson.

Allan and June Nelson were married in 1958 and separated in 1964. Their minor child, Scott Allan Nelson, was born June 30, 1962, and his custody was awarded to his mother in the subsequent divorce proceedings. Allan Nelson remarried in January 1966 and on October 14, 1966, he filed an order to show cause in re modification to obtain Scott's custody. The court, after hearing the testimony of the parties and their witnesses and considering the probation officer's report, denied modification on finding that it would be in the best interests of the child to remain with his mother.

Appellant contends that the court erred in considering the probation officer's unverified report and in depriving appellant of the opportunity to cross-examine the probation officer; that the court was in fact guided by sympathy for the mother rather than by consideration for the child's best interests, and that the order entered on insufficient evidence constitutes

an abuse of discretion. These contentions are without merit.

Scott's mother and father, both under 20 years of age and working at the time of their marriage, adjusted well despite the father's occasional temper tantrums, aggressively reckless driving, and compulsive gambling habits. During 1961 Holmes Penn, a customer of the service station where the father was employed, offered him a position in sales and public relations with M. A. Garrett, Inc., a distributor of banking supplies. The father accepted the position and thereafter spent so much time traveling in the company of Holmes Penn that he was home less than one week of each month. He changed his manner of dressing, had his hair bleached and styled by a professional stylist, and in the mornings frequently set and dried his hair with a hair dryer which he later salvaged when he left his wife. He was displeased when respondent became pregnant, and she felt that he never truly welcomed Scott's advent into their lives. In March 1964 finally acknowledging appellant's antagonism toward his marriage and his strong personal attachments to his new employer, respondent visited a marriage counselor in a vain effort to preserve the marriage. Appellant nonetheless left home in July 1964 and when respondent filed an action for separate maintenance, appellant cross-complained for a divorce which was granted in 1965.

Appellant at the time of the hearing in the custody modification proceedings had been married for about a year to his present wife, a 26-year-old divorcee who is employed by one of the local aircraft companies. Scott visits the couple semi-weekly and has his own bedroom at their comfortable three-bedroom house. The father's chance acquaintance and present employer has rewarded the former service station attendant with a position which pays him about $13,000 plus bonus annually. His present wife is prepared to terminate her employment promptly and devote her full time to the responsibilities of motherhood should the father obtain custody.

Appellant's petition to modify custody was allegedly generated by Scott's casual report during one of his regular visits to his father's home—that one morning he found a Negro man in bed with his mother. Detectives hired by appellant also investigated his former wife and accumulated evidence of her social life on which appellant based his assertion that respondent was an unfit mother. The frankness and candor with which respondent explained her transgressions, however, impressed the court and gave credence to other evidence of her good faith and determination to rectify past errors.

Respondent admitted that during the latter part of July 1966 she met Lenwood Horn, a Negro baseball player, at a night club. Len himself testified that rather than "pick up" respondent, he had introduced himself and let her know that he would like to become better acquainted. He subsequently invited her to attend one of his ball games, and thereafter respondent, frequently accompanied by Scott, often attended baseball games in the park or visited the home of Len's parents for dinner. Several weeks later, and occasionally thereafter, she engaged in sexual intercourse with Len, sometimes at her apartment on the week ends that Scott spent with his father. Ultimately she concluded that in order to avoid further exposure to social censure she should stop dating Len and so advised him, but he refused to accept her edict and came to a party at her apartment. Late that night they went to bed together and early in the morning Scott accidentally came into respondent's bedroom where he found them asleep. Respondent was disturbed by this event and she thereupon determined to lead a better-disciplined life. All parties and witnesses conceded that Scott apparently had suffered no real psychological harm as a result of the incident.

Although detectives testified that they observed one party where liquor was consumed at respondent's apartment, where altercations arose between the guests which resulted in an injury to Len, and where one or two guests remained overnight asleep on the living room floor, respondent explained that the parties were given by her sister and roommate, who has now married and moved away. Respondent admitted that she had engaged in sexual intercourse with several young men, one of whom was Hawaiian, but conceded no moral error because she loved and contemplated marrying, but ultimately rejected, each in turn. Except for one or two imprudent occasions, she used the apartment for amorous activities only on week ends when Scott was away.

Respondent, aged 27, is the product of a concededly underprivileged home and uneducated parents. She is an intelligent young woman who has been attending Pasadena City College where she is working toward a teaching credential, meanwhile being employed as receptionist at a local electronics plant. The probation officer's report and testimony of other witnesses tend to confirm that respondent has established with her son a warm, affectionate and secure relationship. They live in a comfortable, modern two-bedroom duplex apartment with a fenced-in lawn and play yard, maintained by respondent in a clean and attractive manner. While Scott was younger she

worked only part-time in order to be with him, but payments from her former husband will soon terminate so she has obtained full-time employment. Scott is well-adjusted to his nursery school and will attend public school in the fall with nursery care in the afternoons until his mother arrives. Respondent still visits the marriage counselor who is helping her to create a happy life for herself and her son in the face of the unhappiness of separation and divorce. Respondent feels that she now leads a quiet, stable and morally disciplined life with her son.

There was some controversy about the boy's relationship with his father. Respondent claimed that she always had the boy ready and waiting in anticipation of his father's visits, even over the boy's occasional objections. The father testified that he was teaching the boy to swim in their pool; that he built slot cars and visited drag races with the lad; that they enjoyed their week ends together; that he believed his son was eager to visit him and, on the contrary, appeared reluctant to return home to his mother. As is customarily the case, the mother testified that her son was emotionally disturbed for several days following his visits to his father's home. In the light of the entire foregoing testimony, the court was reluctant to breach the strong emotional bond between the boy and his mother and to force the child to readjust to life with a strange new stepmother embarked upon an untried marital relationship with his father.

■ Appellant first contends that the trial court improperly considered the signed, but unverified, probation officer's report. The trial court at the initial hearing announced its intention to obtain a probation officer's report and the parties stipulated to a continuance for several weeks for this purpose. Appellant relies upon certain decisions to the effect that ''The reports of the investigators should be presented in affidavit form, or otherwise under oath, and an investigator, upon timely demand by any party, must appear like any other witness and testify subject to the rules of evidence and the right of cross-examination. It definitely is not the province of investigators to make a private factual report or recommendation to the judge, or any recommendation independent of the evidence upon which it is based.'' (*Fewel* v. *Fewel,* 23 Cal.2d 431, 436 [144 P.2d 592].) In the *Fewel* case, however, the appellate court rejected the trial court's decision because it was based on the unverified, hearsay report of an investigator alone and the court precluded cross-examination, having in effect improperly delegated its own decision-making responsi-

bility to the investigator. In the instant case, both parties had notice that the investigator's report would be received by the court and accordingly the opportunity to prepare for the hearing. Appellant waived, by failure to object, any technical deficiencies in the probation officer's report. Appellant also had the opportunity to require the investigator's attendance for cross-examination, and the court offered to permit him additional time to do so, but he waived this right by concluding in open court that it would not be necessary. Appellant has no basis for asserting this objection on appeal.

 ··Appellant next contends that the court, in reaching its determination, was guided by sympathy toward the mother rather than concern for the child's best interests. This claim is inextricably interwoven with appellant's final contention that the court abused its discretion by rendering its decision on insufficient evidence. We are bound to resolve all ᴖonflicts and indulge all reasonable inferences to uphold the trial court's determination. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) The existing interlocutory judgment granted the mother custody in the perspective of a statutory admonition that ''other things being equal, if the child is of tender years, custody should be given to the mother.'' (Civ. Code, § 138.) Under the circumstances, all intendments rest in the mother's favor, and appellant bore the burden to prove that she was unfit, which he failed to sustain. The trial court was persuaded that the mother's errors did not constitute a continuing course of conduct, would not be repeated, and had not adversely affected her son. That court candidly related its impressions as follows:

''. . . I believe that this woman, under these circumstances, her husband says that she took good care of the boy. There was never any time until this little period of time whenever he went over there and found anything wrong.

''She kept the house well. There was a nice relationship between her and the boy. She loved the boy. The boy loved her. That is attested to by the nursery school, by the Probation Officer and even by the father and by all the relatives. No question about that.

''The relationship is excellent. So, it seemed to me for the best interests of the child of this age that I wouldn't break that bond of affection between child and mother. And I would be in the position of saying that there had been transgressions, but they were not transgressions of a type that I ever expect would be repeated and I do not think it has had any traumatic experience on the boy.''

The trial court further observed: ". . . I was impressed with this woman. I think she is genuinely sorry for what happened. I feel that she has a love to bestow on this boy that he can't get no matter how nice the woman Mr. Nelson's present wife is, that he can't get from a stranger."

"[W]e are here confronted with a question of the discretion vested in the trial court. At the trial both parties appeared as witnesses and were examined and cross-examined at some length. In decisions too numerous to mention, it has been said that the trial judge having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony. And this is especially true where the custody of minor children is involved. An appellate tribunal is not authorized to retry the issue of custody, nor to substitute its judgment for that of the duly constituted arbiter of the facts. Only upon a clear and convincing showing of abuse of discretion will the order of the trial court in such matters be disturbed on appeal. We find no such showing here." (*Currin* v. *Currin*, 125 Cal.App. 2d. 644, 651 [271 P.2d 61].)

Moreover, "It is proper to bear in mind, as these things are being considered, that in determining where custody of children shall lie the courts are not engaged in a disciplinary action to punish parents for their shortcomings as individuals nor to reward the unoffending parent for any wrong suffered by the sins of the other. [Citation.] The prime question is, what is the effect upon the lives of the children and what will be the effect of a modified decree that disturbs their settled life and compels them to make adjustments to a life with strangers." (*Ashwell* v. *Ashwell,* 135 Cal.App.2d 211, 217 [286 P.2d 983].)

"In determining the comparative ability of the parties to adequately care for the children, the court has a wide discretion. The primary consideration is what will promote the best interests of the children." (*Grubaugh* v. *Grubaugh,* 200 Cal. App.2d 151, 155 [19 Cal.Rptr. 141].) The trial court in the instant case considered the comparative factors and made its determination only after a circumspect and deliberate weighing of the evidence. We perceive no abuse of discretion. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

The order is affirmed.

Wood, P. J., and Lillie, J., concurred.