[Civ. No. 28808. First Dist., Div. One. Nov. 11, 1971.]

In re Marriage of GRACE I. and ROBERT M. RUSSO.
GRACE I. RUSSO, Appellant, v.
ROBERT M. RUSSO, Respondent.

**COUNSEL**

Jack Siedman for Appellant.

Molly H. Minudri for Respondent.

**OPINION**

**SIMS, J.**—Appellant, the mother of a daughter born October 14, 1964, who was awarded physical custody of her child by an interlocutory decree of divorce on August 12, 1968, has appealed from an order made and entered March 12, 1970 which granted respondent-father's motion for modification of child custody, and changed the physical custody of the daughter from the mother to the father, with reasonable visitation rights to the mother. She contends that the order changing custody of the minor child must be reversed since it is totally unsupported by the evidence presented to the trial court. As a minor premise she claims that there is no substantial evidence to show that there has been a change in the conditions existing at the time of the original order which would justify modification of that order. On the other hand, the father asserts that the court properly exercised its discretion in providing for custody which was in the best interests of the child.

The record reflects that the parties were married May 19, 1962. Their daughter was born October 14, 1964. The parties separated February 15, 1968, and by agreement the daughter was left in the physical custody of the mother. Although the defendant defaulted in the divorce proceeding, the interlocutory decree was endorsed on his behalf "Approved as to form and content" by his present attorney.[1] The interlocutory decree provided that legal custody of the daughter was awarded to the parties jointly with physical custody to the mother. The father's visitation rights and his obligation to pay $100 per month and furnish health care for his daughter were set forth in detail. A final decree, incorporating the terms of the interlocutory decree by reference, was entered at the request of the wife on March 24, 1969.

The current proceedings were commenced by an order to show cause, issued upon the father's declaration, returnable February 3, 1970. On that date the parties executed a "Stipulation Re Domestic Relations Investigation" which is discussed below, and the court made its order for such an investigation. A report dated March 4, 1970 was returned to the court, and on March 10, 1970 the matter came on for hearing. Testimony was elicited from the father, the maternal grandmother, the mother, and a maternal uncle. On March 12, 1970 a minute order was filed and entered reading as follows: "Respondent's motion for modification of child custody having been heretofore submitted, it is hereby ordered: Physical custody of minor child, Deborah A. Russo, is changed from petitioner to respondent with reasonable visitation rights to petitioner. Child support terminated." On March 16, 1970, the mother filed her notice of appeal from the order. On March 24, 1970 the court signed a formal order prepared by the father's attorney and this order was filed and entered the following day. California Rules of Court, rule 2b, provides in pertinent part, "(2) The date of entry of an appealable order which is entered in the minutes shall be the date of its entry in the permanent minutes, unless such minute order as entered expressly directs that a written order be prepared, signed and filed, in which case the date of entry shall be the date of filing of the signed order." ▮ Since the minute order did not expressly direct that a further written order be prepared, the minute order itself was the proper subject of appeal, and the written order should be deemed redundant. (See *Teichner* v. *Klassman* (1966) 240 Cal.App.2d 514, 525 [49 Cal.Rptr. 742]; and *Lea* v. *Strebe* (1962) 201 Cal.App.2d 227, 230 [20 Cal.Rptr. 20].)[2]

---

[1]In view of a question discussed below as to the effect to be given a domestic relations investigation report, this court has taken judicial notice of and examined the file which was before the trial court.

[2]The father's attorney did request findings at the conclusion of the hearing on March 10, and the court although ostensibly taking the matter under submission,

## I

Before examining the facts it is necessary to determine to what extent the investigation report of a domestic relations commissioner (Code Civ. Proc., § 263)[3] was before the court. The appellant states: ". . . at no time was that report ever put into evidence by either party." She, therefore, limits her discussion of the contents of the report to such extracts as were read into the record by the trial judge or either party. The stipulation (see fn. 1 above), however, provides in part: ". . . The original of said report shall be filed with the Clerk of the Domestic Relations Department as an exhibit in the case and shall thereupon be deemed admitted in evidence for the purpose of any hearing in the above entitled action subject, however, to motion to strike the same or any part thereof, and subject to the right of the Court, or any party, to call said Domestic Relations Investigator, and any person interviewed by her, or otherwise referred to and relied upon in making said report, to testify as a witness as to any matter referred to in said report, and to call such other witnesses or introduce such other evidence as any party may desire." At the outset of the hearing the court indicated it had read and considered the report of the Domestic Relations Commissioner. There are frequent references to the report, or to matters reported therein during the proceedings in open court. There was no motion to strike all or any part of the report, except a letter which is re-

---

directed the attorney for the mother to prepare findings. "The universal practice in this state is not to require findings on an order made after motion. [Citation.]" (*Waymire* v. *California Trona Co.* (1917) 176 Cal. 395, 399-400 [168 P. 563].) This principle applies to an order granting a motion for change of custody in a divorce proceeding. (*Mathewson* v. *Mathewson* (1962) 207 Cal.App.2d 532, 535 [24 Cal.Rptr. 466]. Cf. Code Civ. Proc., § 632, and Cal. Rules of Court, rule 232.)

[3]Code of Civil Procedure section 263 provides in pertinent part: "In any county, or city and county, which is authorized by law to have domestic relations cases investigators, it shall be the duty of such domestic relations cases investigators, in any divorce action then pending wherein the parties thereto have minor children, to investigate and to report to the judge of the court wherein such action is to be tried all pertinent information as to the care, welfare and custody of the minor children of the parties to the divorce action.

"Such report shall be filed not less than 10 days before the date set for trial of the divorce action with the clerk of the court wherein such action is to be tried, and not less than 10 days before the trial of such action a copy of the report shall be served on each party to the divorce action.

"The report of the investigators shall be admitted in evidence upon the stipulation of both parties, and shall be competent evidence as to all matters contained therein.

"Such investigator or investigators who have investigated the care, welfare and custody of the minor children as provided for in this section, shall be present at the trial of the divorce action of the parties who are the parents or custodians of such minor children, and may be called to testify by the judge or either party as to any matter which they have investigated. The testimony of such investigators shall be subject to questions direct and cross which are proper, and shall be competent as evidence."

ferred to below, nor was there any request to examine the commissioner. ██ Under these circumstances a report of a commissioner under Code of Civil Procedure section 263, or a report of a probation officer under Welfare and Institutions Code section 582 (see also Civ. Code, § 4602), may and should be considered to the extent it contains unchallenged facts. (See *Sanchez* v. *Sanchez* (1961) 55 Cal.2d 118, 125 [10 Cal.Rptr. 261, 358 P.2d 535]; *Long* v. *Long* (1967) 251 Cal.App.2d 732, 735-737 [59 Cal.Rptr. 790]; *Swain* v. *Swain* (1967) 250 Cal.App.2d 1, 7-8 [58 Cal. Rptr. 83]; *Dahl* v. *Dahl* (1965) 237 Cal.App.2d 407, 412-414 [46 Cal. Rptr. 381]; and *Forslund* v. *Forslund* (1964) 225 Cal.App.2d 476, 494-498 [37 Cal.Rptr. 489]; Cf. *Fewel* v. *Fewel* (1943) 23 Cal.2d 431, 433-436 [144 P.2d 592]; and *Washburn* v. *Washburn* (1942) 49 Cal.App.2d 581, 589-591 [122 P.2d 96].)

## II

About three years prior to the hearing, while the parties were living together with their daughter, they established their residence in a three-bedroom flat at 263 Carl Street in the Haight-Ashbury district. After they separated, February 15, 1968, a little more than two years before the hearing, the mother continued to reside at that address and was living there at the time of the hearing. During all of this period, with the exception of a few months ending shortly prior to the inception of the present proceedings, the daughter lived with her mother at the Carl Street address. Following the separation the mother secured employment with a bank and during work left her daughter at the home of her godparents in the care of the grandmother of their two children. When the grandmother's age precluded her assuming further responsibility for the extra child, the daughter was placed in the Jefferson Pre-School Day Center. The mother took her there in the morning and picked her up after work. After a year, when the child reached school age, she was transferred to the Jefferson School Day Center to enter kindergarten. The child was disturbed because she found herself with a different group of children and different teachers, and so the mother withdrew her from school about the end of September 1969 and left her with the maternal grandmother until she could make other arrangements.

The father's declaration dated January 10, 1970, alleged that the child had been with the maternal grandmother for a period commencing six months, and terminating two weeks before the declaration was signed, or from July 10, 1969 to December 27, 1969. His testimony indicates that she was removed from the grandmother's home shortly after Thanksgiving. The mother stated that she took the child back to her home in the middle of December. A statement in the domestic relations investigation report, echoed at the hearing by the father's attorney, that the mother and daugh-

ter, or at least the child, lived with the maternal grandmother from the time her parents separated until she was last removed, is not sustained by the record. ■ Since the statement in the report can only be based on hearsay, it should be disregarded. (See *Sanchez* v. *Sanchez, supra,* 55 Cal. 2d 118, 125; and *Long* v. *Long, supra,* 251 Cal.App.2d 732, 736; but cf. *Dahl* v. *Dahl, supra,* 237 Cal.App.2d 407, 413; and *Forslund* v. *Forslund, supra,* 225 Cal.App.2d 476, 498.) Moreover, both the father and the maternal grandmother were available to contradict the mother's testimony concerning the custody of the child prior to September 1969, and neither was called to do so. In fact the grandmother corroborated her daughter when she testified, "Until November of last year she [the child] could not have a better mother, and when I say a better mother I am talking about Debbie Ann Russo. She had a wonderful home." She also stated that she gave up the child to the mother on December 16.

The mother testified that it was necessary to leave her daughter with the grandmother over night because her parents' home was near Daly City and she was working at 6th and Market, and did not have sufficient time before or after work to deliver or pick up her child if she kept the girl at home. The mother testified that she was looking for other arrangements, preferably another child care center, but was unable to locate any until she found a friend in her neighborhood who would care for the child during the day.

It was during this period that friction first developed. In his declaration the father alleged: "That in November 1969, respondent was concerned with the fact that said minor child was not attending pre-school, and offered to enroll said minor child in Notre Dame des Victoires; that petitioner refused to permit said enrollment or application therefore by respondent, and stated that she 'did not want her child exposed to a Catholic atmosphere, or training all day, where she would hear about the ways things should be one way, and then come home to face a different situation'. . . ." At the hearing he testified to the same effect. It was brought out that he had consulted his attorney on this question in October. The trial judge volunteered that both of his children had been reared at that school, and the father's attorney chimed in that her daughter also had attended the same school.

According to the grandmother something happened to her daughter in November 1969, the mother no longer had time to take the child or the capability of making her a proper home. The mother admitted to the investigator and at the hearing, that at her invitation, a young Caucasian 22 years of age lived with her at the Carl Street address from November 12, 1969 until February 7, 1970 when she asked him to move. She told the

investigator that she believed she could help the young man with his problems in that he was attempting to evade the draft, and he had been told that he could not get draft counseling help until he was actually drafted. At the hearing she assured the court that she had no intention of ever resuming that kind of relationship with that young man, and no intention of living under the same roof with any man without getting married. An attempt to show, despite the mother's denial, that her former male companion had been with the mother and daughter on the Sunday preceding the hearing foundered for lack of direct knowledge on the part of the testifying grandmother.

In the middle of December the mother found a friend who lived five or six blocks away who would take care of her daughter during the daytime as a favor on a temporary basis. The mother then reclaimed her child, left her with the friend in the daytime, and brought her into her home with her male companion at night. In his declaration the father alleged that this baby-sitter was unlicensed; that on January 9, 1969 he went to visit his daughter at the residence of the baby-sitter and inspected the premises; that he found a 2-year-old child present; that the furniture consisted of a small mattress on the floor, and a couch without legs which appeared to be resting on the floor; and that the room was littered and housekeeping standards appeared to be poor. He stated that the baby-sitter did not furnish proper supervision or proper surroundings, and that she was barefooted, and lax in her housekeeping standards; and that her premises were without adequate play area, or yard, or sleeping facilities for naps for a 5-year-old child. The investigator did not report on this baby-sitter because it appeared that new arrangements, reviewed below, were effected at or about the time the order to show cause was issued. At the hearing the father testified as to the conditions he found at the premises of the first baby-sitter. The mother testified that this baby-sitter, who was on welfare, was a good woman and should not be judged by her furniture.

The mother testified that she was continuing to attempt to find a child care center while the child was with the first baby-sitter, and had her name on many waiting lists. She stated that around the first of February a neighbor told her about the second baby-sitter, a 49-year-old married woman, she had known for four or five months who lived around the corner a block away; that she made arrangements for her to care for the child in the daytime and paid her $15 a week from her own earnings; that the couple have four or five children, one of whom is in the service, and a 12- or 13-year-old child at home; that her daughter had a warm relationship with the couple, loved the baby-sitter's husband; and that they had taken the child to Clear Lake with them for a weekend. The mother acknowledged that this baby-sitter was not licensed, although she was not familiar with any such require-

ment of law. The investigator reported that the second baby-sitter stated that she began taking care of the child for $15 per week approximately two months prior to the date of the report (March 4, 1970). The investigator found that the household standards in the sitter's home appeared to be fair, and he concluded that the child care plan currently being provided was just adequate for the child's needs. The father only found out the address of the second baby-sitter when he saw the report, and had no opportunity to inspect the premises prior to the hearing.

The child's routine at the time of the hearing was as follows: Her mother drove her to a school bus stop where she took a chartered school bus at 8:20 a.m. The mother than went on to her work at the 16th Street Branch of the Bank of California where she was employed as a teller and for general clerical duties. The stop was near the site of a neighborhood school which is being rebuilt. The child, and other children who also were waiting for the school bus, were supervised by an adult as they waited. The investigative report reflects that the girl was enrolled in kindergarten in the Corbett School on February 4, 1970, and that she had been absent one day with an excuse from her mother. The child appeared at school well dressed and got along well with her teachers and fellow students. The child returned from school at 11:30 a.m. and was let off the bus in the same area she was picked up. There was no one to meet her, but she walked the three blocks to the baby-sitter's home with other children. At the baby-sitter's she was fed and played indoors or outdoors in the yard with a dog, or with the baby-sitter's son who made toys for her. The mother would pick up the child on her return from work.

On the weekends the daughter usually spent Saturday with her father and Sunday with her mother.[4] The father acknowledged that he usually saw his daughter every weekend and had her overnight, and for two weeks during vacation. His visitation was interrupted for a period of two weeks, immediately after he filed and served his declaration and the order to show cause, until counsel arranged for restoration of his privileges. On Sundays the mother took the child to the beach or zoo, or for a walk in the park. The father complained that, as revealed by the report, the mother left the child with the baby-sitter overnight. According to the mother this happened on

---

[4]The interlocutory decree provided that the father should have his daughter with him on alternate weekends for one day, either Saturday from 9 a.m. to 8 p.m., or Sunday from 9 a.m. to 6 p.m., as might be arranged. It also provided that the father would have the child for two weeks during the summer vacation until after the child's sixth birthday, and thereafter for six weeks. Thanksgiving and Christmas were to be alternated between the parties by mutual agreement, and visitation on Mother's Day, Father's Day and the defendant's birthday was expressly outlined.

two occasions, once when she went to a late movie, and once when the baby-sitter and her husband took the child to Clear Lake.

Apparently the catalytic agents for the current proceedings were the presence of the man in the house, and the untidy baby-sitter. The father alleged in his declaration that when he picked up the child on January 9, she told him "that 'that man' was living in the home with her mother, drank beer, and on occasion had spanked her very hard." He further alleged that his daughter appeared to be frightened of " 'that man' " and told him that "she was 'afraid when that man yelled and banged things around.' " He verified her remarks at the hearing. The maternal grandmother also testified that the child hated the man in her mother's home. Attempts to bring out that the child had told her grandmother that she had seen the man and her mother in the nude were stultified by the grandmother's evasive answers, the mother's objection, and the court's rulings on the objection. The mother's termination of this relationship has been related above. The father testified that on the visitation immediately preceding the hearing on March 10, 1970, the child did not mention her homelife, and only commented that she had a new baby-sitter and was going to school. The domestic relations investigator commented, "In consideration of the child's welfare, recognition should be taken to the comments of the maternal grandparents [discussed below] together with the mother's own admission of having a man live with her, not her husband. It is felt that this situation can well provide a great deal of conflict in the child's mind and should be resolved."

The comments of the maternal grandparents are found in a letter attached to the investigation report. It is addressed to the commissioner, and reads, "Dear Sir: [¶] We do not approve of the granddaughter . . . being raised in a place where narcotics are used." It is apparently signed by each of the mother's parents. At the conclusion of the mother's direct testimony the court read the letter to her and asked, "How about that?" She replied, "I don't understand the letter, and it hurts me to have my parents writing something like that about me." On cross-examination she stated that her parents had unwarrantedly accused her of using pills and drugs. She categorically denied that she had gone into hysterical scenes with her parents, or that she had manifested that she had been under the influence of pills or drugs in their presence, or that there was marijuana in her home, or had been marijuana in her home when her male companion was there.

Thereafter, the mother moved to strike the grandparents' letter from the record because it was irrelevant in that the declaration itself failed to show that the declarants had any personal knowledge that narcotics were used at the daughter's home, and was incompetent as a hearsay, out of court, statement, and beyond the scope of a character type reference sought by the

commissioner. The court overruled the objection. ■ The motion to strike was authorized by the stipulation concerning the investigation report which has been quoted above. The grandfather was in court at the morning session of the hearing, and the grandmother was in court throughout the proceedings, and in fact testified at the afternoon session. She, however, did not give any testimony to substantiate the accusation implicit in the letter. In *Long* v. *Long, supra,* the court stated, "To deny a litigant the right to cross-examine a witness who testifies against him is a denial of due process of law. [Citations.] The error is compounded when hearsay evidence directly contradicts testimony given under oath in open court and in the presence of the litigant." (251 Cal.App.2d 732, 736. See also *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 125.) Here, unlike *Long,* there was no unqualified stipulation waiving evidentiary objections to matters in the commissioner's report. Unlike *Sanchez,* there was no other evidence substantiating the hearsay declaration of the grandparents. The court erred in failing to strike the letter from the record.

The only other evidence relating to the subject of the use of drugs was the testimony of the father that he suspected that the mother was using marijuana because the child had asked him why he did not smoke marijuana, and he himself had never used the substance or referred to it in the presence of the child. He had never asked his ex-wife about her use of drugs. When confronted with the fact that the child had raised the question, the mother could give no explanation of where she got the idea or knowledge of the word "marijuana" unless it were from watching the television.

The mother acknowledged that at the time she regained custody of her daughter in December she quarreled with her parents because they did not like the way she was living, and objected to her having a man in her home. She volunteered that they objected to everything she did and had even opposed her marriage. Her 40-year-old brother corroborated his sister, and stated that the grandparents never could let their own children grow up and run their own lives. He stated that his sister had been well educated, had a cultural background, and had studied opera singing. He praised his sister's abilities and mannerisms and her way of bringing up her daughter. He referred to his niece as a very well-mannered and well brought up young lady, and noted that she was healthy and well cared for by her mother.

The investigation report further recited: "Household standards in the mother's home appear to be good with the child having a bedroom and sleeping quarters to herself. Mother-daughter relationship appeared to be good. . . . [¶] [The child] was seen in the mother's home at interview. She appeared to be a bright, active child who voiced her concern at the separation of her parents. She stated at the time of the home visit that she

wanted to stay with her mother." One reference given by the mother failed to answer. Another couple replied tardily and could only attest to the devotion of the mother to her child before the separation and divorce when they had last known her.

The report sets forth the plan of the father, a 10-year employee of the Bank of America, to secure a two-bedroom apartment in Daly City where he was residing at the time of hearing, and his arrangements for day care with a licensed baby-sitter. He also testified concerning his plans and added that the baby-sitter was located two blocks from a school. Letters from his parents and two character references attest to his fitness as a father.

The report concludes, "From the investigation just concluded, it would appear that either parent could provide the necessary care for their daughter Deborah as they are both employed. . . ."

### III

The principles to be applied to the foregoing facts are well established. Section 4600 of the Civil Code provided in pertinent part at the time of these proceedings: "In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding, or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. Custody should be awarded in the following order of preference: (a) To either parent according to the best interests of the child, but, other things being equal, custody *shall* be given to the mother if the child is of tender years. . . ." (Italics added. By Stats. 1970, ch. 1545, § 2, p. 3139, effective Nov. 23, 1970, the word "shall" was changed to "should." Cf. former Civ. Code, § 138; Stats. 1951, ch. 1700, § 6, p. 3911.)

In following the admonition of the prior statute which read "other things being equal, if the child is of tender years, custody should be given to the mother" (former Civ. Code, § 138), the interlocutory decree gave physical custody to the mother. ■ The father in the trial court bore the burden of showing that the "best interests of the child" (see Civ. Code, § 4600, and former § 138) required a change in her custody. (*Nelson* v. *Nelson* (1968) 261 Cal.App.2d 800, 805 [68 Cal.Rptr. 427].) In construing similar provisions of earlier law the court said in *Taber* v. *Taber* (1930) 209 Cal. 755 [290 P. 36], "In determining whether other things are equal within the meaning of the above code section, the trial court is necessarily allowed a wide latitude in the exercise of its discretion. In the first instance

it is for the trial court to determine, after considering all the evidence, how the best interests of the child will be subserved. The question is to be determined solely from the standpoint of the child, and the feelings and desires of the contesting parties are not to be considered, except in so far as they affect the best interests of the child." (209 Cal. at pp. 756-757. See also *Munson* v. *Munson* (1946) 27 Cal.2d 659, 666 [166 P.2d 268]; *Bialac* v. *Bialac* (1966) 240 Cal.App.2d 940, 946 [50 Cal.Rptr. 12]; *Coddington* v. *Coddington* (1962) 210 Cal.App.2d 96, 100 [26 Cal.Rptr. 431]; *Mathewson* v. *Mathewson* (1962) 207 Cal.App.2d 532, 536-537 [24 Cal.Rptr. 466]; *Stack* v. *Stack* (1961) 189 Cal.App.2d 357, 365-366 [11 Cal.Rptr. 177]; *Jenkins* v. *Jenkins* (1954) 125 Cal.App.2d 109, 117 [269 P.2d 908]; and *Sorrels* v. *Sorrels* (1951) 105 Cal.App.2d 465, 468-469 [234 P.2d 103].)

In *Prouty* v. *Prouty* (1940) 16 Cal.2d 190 [105 P.2d 295], the court said, "It must be borne in mind that in every proceeding to modify a provision for the custody of a minor child the burden is on the moving party to satisfy the court that conditions have so changed as to justify the modification." (16 Cal.2d at p. 193. See also *Forslund* v. *Forslund, supra,* 225 Cal.App. 2d 476, 491; *Ashwell* v. *Ashwell* (1955) 135 Cal.App.2d 211, 213 [286 P.2d 983]; and *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469.) "The 'change of circumstances' rule is judge made. Its purpose is to protect the court, the parties and the child from interminable and vexatious litigation." (*Stack* v. *Stack, supra,* 189 Cal.App.2d at p. 369. See also *Munson* v. *Munson, supra,* 27 Cal.2d 659, 666; *Foster* v. *Foster* (1937) 8 Cal.2d 719, 726-727 [68 P.2d 719]; *Dahl* v. *Dahl, supra,* 237 Cal.App.2d 407, 411-412; and *Forslund* v. *Forslund, supra,* 225 Cal.App.2d 476, 492.)

The controlling rule is set forth in *Gudelj* v. *Gudelj* (1953) 41 Cal. 2d 202 [259 P.2d 656], as follows: "In a divorce proceeding involving the custody of a minor, primary consideration must be given to the welfare of the child." (41 Cal.2d 202, 208. See also *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 121; *Prouty* v. *Prouty, supra,* 16 Cal.2d 190, 195; *Taber* v. *Taber, supra,* 209 Cal. 755, 757; *Stack* v. *Stack, supra,* 189 Cal.App.2d 357, 364; and *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469.)

In reviewing the facts and circumstances to determine the best interests of the child the trial court should be guided by the following considerations: "Although 'The question as to whether a parent is a fit or proper person to have the custody of a minor child refers . . . to his or her fitness at the time of the hearing and is not necessarily controlled by conduct . . . prior thereto' (*Munson* v. *Munson* (1946) 27 Cal.2d 659, 665 . . . , quoting from *Prouty* v. *Prouty* (1940) 16 Cal.2d 190, 194 . . .), such prior conduct may, of course, be considered by the court in determining

with which parent the best interests of the child will be found." (*Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 124. See also *Dahl* v. *Dahl, supra,* 237 Cal.App.2d 407, 415; and *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469.) ■ "It is proper to bear in mind, as these things are being considered, that in determining where custody of children shall lie the courts are not engaged in a disciplinary action to punish parents for their shortcoming as individuals nor to reward the unoffending parent for any wrong suffered by the sins of the other." (*Ashwell* v. *Ashwell, supra,* 135 Cal. App.2d 211, 217. See also *Bialac* v. *Bialac, supra,* 240 Cal.App.2d 940, 946-947; *Mathewson* v. *Mathewson, supra,* 207 Cal.App.2d 532, 537-538; *Stack* v. *Stack, supra,* 189 Cal.App.2d 357, 371; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 471; and *Washburn* v. *Washburn* (1942) 49 Cal. App.2d 581, 588 [122 P.2d 96].)

■ On review this court is bound by the following rule: "An application for a modification of an award of custody is addressed to the sound legal discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion." (*Foster* v. *Foster, supra,* 8 Cal.2d 719, 730. See also *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 121; *Gudelj* v. *Gudelj, supra,* 41 Cal.2d. 202, 208-209; *Munson* v. *Munson, supra,* 27 Cal.2d 659, 666; *Prouty* v. *Prouty, supra,* 16 Cal.2d 190, 191; *Taber* v. *Taber, supra,* 209 Cal. 755, 757; *Forslund* v. *Forslund, supra,* 225 Cal.App.2d 476, 490-491; *Mathewson* v. *Mathewson, supra,* 207 Cal.App.2d 532, 539; *Stack* v. *Stack, supra,* 189 Cal.App.2d 357, 368; and *Ashwell* v. *Ashwell, supra,* 135 Cal.App.2d 211, 213.)

In *Sanchez* v. *Sanchez, supra,* abuse of discretion was equated with the nonexistence of substantial evidence to support the order of the lower court. The court concluded, "There were, as is not unusual in a proceeding of this nature, conflicts both as to probative facts and as to the proper inferences to be drawn from such facts. But, as is true in all appellate reviews, and most emphatically in this type of controversy, it is not the function of this court to reweigh conflicting evidence and redetermine findings; neither is this court vested with discretion to be exercised in the premises. Our function has been fully performed when we find in the record substantial evidence which supports the essential findings of the trial court. [Citations.]" (55 Cal.2d at p. 126. See also *Stack* v. *Stack, supra,* 189 Cal.App.2d 357, 368; and *Forslund* v. *Forslund, supra,* 225 Cal.App.2d 476, 491 and 499.)

In *Stack,* the court observed, "We find no authority distinguishing between insufficient evidence and abuse of discretion. It would seem obvious that, if there were *no* evidence to support the decision, there would be an abuse of discretion. But we do not think that it follows that there can be

no abuse of discretion if there be any evidence to support the decision. It is certainly true that there could be a case where the decision is obviously not for the best interests of the child, even though there is some evidence to support it. We think that a number of the cases cited in this opinion, in which an order was reversed, fall into this category." (189 Cal.App.2d at p. 368.)

In *Forslund* the court reversed the order for insufficient evidence. It applied the following test, "The meaning of substantial evidence is well stated in *Estate of Teed,* 112 Cal.App.2d 638 . . . as follows: '[I]t clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be *"substantial"* proof of the essentials which the law requires in a particular case.' (P. 644; italics added; accord: *Dyer* v. *Knue,* 186 Cal.App.2d 348, 351 . . . ; *Estate of Bishop,* 209 Cal.App.2d 48, 53. . . .)" (225 Cal. App.2d at pp. 499-500.)

With the foregoing precepts in mind, the evidence in this case may be reviewed.

## IV

The obvious solution is to follow the lead of numerous cases which have upheld a transfer from maternal to paternal custody where there was some evidence of instability in the life of the mother which precluded her from performing her parental responsibility to her child, or which had a detrimental emotional impact on the child. (See *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 121-124; *Munson* v. *Munson, supra,* 27 Cal.2d 659, 661-663; *Taber* v. *Taber, supra,* 209 Cal. 755, 757-758; *Dahl* v. *Dahl, supra,* 237 Cal.App.2d 407, 409-411; *Mathewson* v. *Mathewson, supra,* 207 Cal.App. 2d 532, 534-535; and *Grubaugh* v. *Grubaugh* (1962) 200 Cal.App.2d 151, 152-154 [19 Cal.Rptr. 141].)

In *Ashwell* v. *Ashwell, supra,* the court recognized the general rule of review as follows: "In the resolution of the issue as to which of two parents shall have custody much is committed to the sound legal discretion of the trial court and the decision will not be reversed on appeal unless there is a clear abuse of discretion." (135 Cal.App.2d at p. 213.) Nevertheless, it reversed an order which had changed the custody of five children, who were between the ages of 2 and 6 at the time they were awarded to the mother in August of one year, from the mother to the father, on the latter's application filed the following January. The court observed, "There is no worthwhile dispute here but that Norma took good care of her children, and if

she did that then anyone who has observed the tasks that must be performed by a mother in caring for four tiny children will know that she is the hardworking, and, toward her children, the conscientious woman that her neighbors testified she was. If support is to be found for the order, therefore it must be found in her meretricious relations with Casella resulting in the birth of a fifth child. Upon examination, and in view of the applicable case law and the statutory command, these derelictions do not measure up in quantity and quality to justification for depriving these children of their mother. Except for her relations with Cassella, there is nothing in this record to indicate that Norma is a loose woman. There is here no proof that she is amoral. There is proof of error, but along with it goes proof of her acceptance of the consequences and her expressed desire to regularize, within the possible limits, her habitation with Cassella, the father of her youngest child." (*Id.* at p. 216.)

Although *Ashwell* has often been distinguished in other cases,[5] an examination of those cases reflects facts demonstrating maternal misconduct far in excess of anything found in *Ashwell,* or in this case. It still stands for the following propositions: "Sexual misconduct per se does not render a mother unfit. There was no showing . . . that the children knew or were old enough to suspect or that there was so much done in their presence that they might be expected to suspect anything about their mother's misconduct." (*Bialac* v. *Bialac, supra,* 240 Cal.App.2d 940, 946-947. See also *Nelson* v. *Nelson, supra,* 261 Cal.App.2d 800, 805; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 470-471; and *Washburn* v. *Washburn, supra,* 49 Cal.App.2d 581, 587.)

In *Forslund* v. *Forslund, supra,* the court ordered the custody of children changed from the father to the mother because the father was "subjecting the children 'to a rather irregular and poorly controlled living condition.' " (225 Cal.App.2d at p. 500.) This court found an abuse of discretion because there was no substantial evidence to show that the father's shortcomings—inability to offer a stable environment for the children, frequent moving disrupting their schooling, difficulties with his creditors—were any different than at the time the original order was made, or to show that such shortcomings affected his children's welfare. (*Id.,* pp. 496-502.)

 In the light of the foregoing precedents, it cannot be said that the mother's admitted indiscretion in making a home for a male companion

---

[5]See *Mathewson* v. *Mathewson, supra,* 207 Cal.App.2d 532, 539; *Grubaugh* v. *Grubaugh* (1962) 200 Cal.App.2d 151, 154 [19 Cal.Rptr. 141]; *Kelly* v. *Kelly* (1959) 173 Cal.App.2d 469, 475 [343 P.2d 391]; *Taylor* v. *Taylor* (1957) 150 Cal.App.2d 104, 106 [309 P.2d 508]; *Kemmer* v. *Kemmer* (1956) 142 Cal.App.2d 233, 237 [298 P.2d 26]; and *Yates* v. *Yates* (1956) 138 Cal.App.2d 711, 717-718 [292 P.2d 934].

from November to February necessitated a change in custody as a matter of law. It cannot be determined whether the court exercised its discretion on that circumstance alone, or on all the facts before it. If there were errors in considering other circumstances which may have led to the court's ultimate finding, the mother is entitled to a reversal. An examination of the record reveals such errors.

The father's declaration raised an issue concerning the temporal and spiritual education of his daughter. ▆▆▆ "The essence of custody is the companionship of the child and the right to make decisions regarding his care and control, education, health, and religion." (*Lerner* v. *Superior Court* (1952) 38 Cal.2d 676, 681 [242 P.2d 321]. See also *Miller* v. *Hedrick* (1958) 158 Cal.App.2d 281, 284-285 [322 P.2d 231].) In *Cory* v. *Cory* (1945) 70 Cal.App.2d 563 [161 P.2d 385], the court stated, "We have been cited to no case, and believe none will be found, wherein it has been held that the courts may deprive parents of the custody of their offspring because of a disagreement with such parents as to their religious views, at least, as long as their teachings do not conflict with the laws of the land." (70 Cal.App.2d at p. 570.) In the absence of findings it is impossible to know whether the court erroneously considered these matters in its ultimate conclusions. It does appear, however, that the judge indirectly manifested approval of the father's choice of schools.

The father points to the facts, developed at the hearing, that the young child was left at a bus stop in the morning by her mother, and on her return had to walk three blocks to her baby-sitter's home. The fact that the children were supervised in the morning is overlooked. Some significance is attached to the fact that this occurs in the "Haight-Ashbury District." At the hearing the father's affirmative answer to the leading question "You know it is in a rather bad neighborhood?" was stricken on the mother's objection. The father's further attempts to develop the character of the neighborhood by asking "Have you taken a look at that particular area in the Haight-Ashbury during the daytime?" was preempted by the judge's remark, "Give me credit for some sense."

"Judicial notice may not be taken of any matter unless authorized or required by law. (Evid. Code, § 452 [*sic* 450].) This court is compelled to take judicial notice only of facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute. (Evid. Code, § 451.) If there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge, evidence should be required. (*Varcoe* v. *Lee*, 180 Cal. 338, 345. . . .)" (*Barreiro* v. *State Bar* (1970) 2 Cal.3d 912, 925 [88 Cal.Rptr. 192, 471 P.2d 992].) In the cited case, *Varcoe* v. *Lee*, the court upheld an instruction predicated

on judicial notice that a specific two blocks on Mission Street in San Francisco was a "business district" within the meaning of that term as used in a provision of the Motor Vehicle Act limiting speed in such districts. The court said, "The character of Mission Street is as well known to San Franciscans as the character of Spring Street to residents of Los Angeles, or of State Street to residents of Chicago, or of Forty-second Street to residents of New York, or of F Street to residents of Washington. It is a matter of their every-day common information and experience and one about which there can be no dispute." (180 Cal. at p. 347.) The court did, however, sound the following note of caution, "It should perhaps be noted that the fact that the trial judge knew what the actual fact was and that it was indisputable would not of itself justify him in recognizing it. Nor would the fact that the character of the street was a matter of common knowledge and notoriety justify him in taking the question from the jury if there were any possibility of dispute as to whether or not that character was such as to constitute it a business district within the definition of the statute applicable. If such question could exist, the fact involved——whether the well-known character of the street was sufficient to make it a business district—was one for determination by the jury. But we have in this case a combination of the two circumstances. In the first place, the fact is indisputable and beyond question. In the second place, it is a matter of common knowledge throughout the jurisdiction in and for which the court is sitting." (*Id.*, p. 344.)

Whatever may be said for other characteristics of the Haight-Ashbury district, it is not a matter of everyday common information and experience, or one about which there can be no dispute, that it is unsafe for infants to walk in at 11:30 in the morning. If it were so, the school children there might well all be made wards of the juvenile court for their own safety. The latter rule, and not the former, must apply. Here again it is impossible to determine what weight, if any, the judge gave to his unauthorized knowledge or convictions concerning the character of the neighborhood through which the child passed on her way home from school.

Moreover, it should be noted that it was the father, and not the mother, who selected this district in which to make a home for his wife and daughter. She cannot be blamed for continuing her residence there.

Subsequently at a time when the mother was telling of the change she had made in the day care for her daughter the judge interjected, "I am being patient, but I am getting a little weary listening to this." In the absence of findings it may well be that the court, through weariness, failed to consider the mother's efforts to better the conditions of which the father complained.

At the end of the morning session, as the father's attorney was cross-

examining the mother, the judge interrupted to state, "I am ready to dispose of this if you let me." The father's attorney ceased her questioning. The judge, without consulting the attorney for the mother as to whether he had further questions of his client or further evidence, asked counsel whether they had seen the investigator's report. Upon receiving an affirmative answer from the father's attorney, who had previously expressed her dissatisfaction with the report because it came to no conclusion, the judge stated: "Which you regarded as inconclusive and unsatisfactory. *However, I have had the benefit of a conference with them on the basis of this report.* Let me just read aloud what it says here: From the investigation just concluded it would appear that either parent could provide necessary care for their daughter Debra as they are both employed. In consideration of the child's welfare recognition should be taken to the comments of the maternal grandparents. Therefore, her parents together with the mother's own admission of having a man living with her not her husband, we felt this situation can well provide a great deal of conflict in the child's mind and should be resolved. And then we have in mind the testimony of what the child told the father. Therefore, for these reasons the motion is granted." (Italics added.) The father's attorney then announced that she had not completed her case, the judge apologized, and the hearing was continued until the afternoon session of the court.

It is impossible to know what evidence or recommendation was received by the court in his conference with the domestic relations commissioner. The proceedings must be reversed for this reason alone. (See *Fewel* v. *Fewel, supra,* 23 Cal.2d 431, 433-436; and *Washburn* v. *Washburn, supra,* 49 Cal.App.2d 581, 590.) In the case last cited the court stated, ". . . an investigator stands in no better position than an ordinary witness, and must be available for complete cross-examination on any matter on which he or she reports at the instance of a judge. Moreover, an investigator may make no secret report, but stands like any other person—subject to an order of contempt if he does. There is no back door to the courts for witnesses, investigators, litigants or others." (49 Cal.App.2d at p. 590.)

Furthermore, it should be noted that the court may well have considered, as did the report, the objectionable comments of the maternal grandparents which incompetently attempted to link the mother with the use of drugs. Since there is insufficient substantial evidence to sustain a finding that the mother did use drugs or marijuana, it is unnecessary to determine whether use of the latter is more detrimental to the best interests of the child, than was the illegal consumption of alcoholic beverages by a generation of mothers who spawned and reared many of those who now sit in judgment on others.

The father places undue weight on the fact that neither the first nor the second baby-sitter was licensed. Chapter 1 of part 4 of division 9 (§§ 16000-16018) of the Welfare and Institutions Code provides for the licensing of institutions for child care. It provides in part, "No person, association, or corporation shall, without first having obtained a written license or permit therefor from the department or from an inspection service approved or accredited by the department: (a) Maintain or conduct any institution, boarding home, day nursery, or other place for the reception or care of children under 16 years of age, nor engage in the business of receiving or caring for such children, nor receive nor care for any such child in the absence of its parents or guardian, either with or without compensation. . . ." (§ 16000, subd. (a).) An exemption for casual receiving and care of children would apparently not apply to the situation in this case.[6] The person who cares for a child in violation of the statute is guilty of a misdemeanor (§ 16013). ▆▆ Since the statute is presumably for the benefit of the child and parent who need care, it is unthinkable that either would be *in pari delicto*, or guilty of the felony of conspiring to commit a misdemeanor. The mother should not be faulted for attempting, without knowledge of any licensing act, to provide day care for her daughter so she could be with her mother when the mother was not working. Although the father did not approve of the "life style" of the first sitter, it was not shown that the daughter suffered from her care. The substitution of sitters rendered further consideration of that placement moot. It was not shown that the second sitter was in any way incompetent, or even that she was not possessed of the qualifications necessary for a license. The report, although not effusive, did acknowledge: "The child care plan currently being provided is just adequate for the child's needs. Household standards in this home appear to be fair." The child who apparently received the warm affection of the part-time foster family could in no way be affected by the presence or absence of a license which she could not read.

The case may well distill itself into the question of the effect on the welfare of the child, of the admitted improper liaison of the mother and the young man. That affair, as terminated, did not require a change of custody as a matter of law. The other factors have been examined, not for the purpose of reweighing the evidence before the trial court, but for the purpose of determining whether they, when stripped of matters improperly before

---

[6]Section 16001 provides: "The provisions of Section 16000 shall not apply to the receiving and care of a child or children under 16 years of age by a relative, nor to such receiving and care of children from only one family by a close friend of the parent or guardian with the consent of the parent or guardian, when such receiving and care is without compensation and occurs only occasionally and irregularly, or, if regularly given, is for an average of three hours or less, on days when the care is provided."

the court, and when coupled with the admitted past transgression, would require a change of custody. It is concluded they would not. It may not have been an abuse of discretion to change the custody on the evidence properly received. (Cf. *Forslund* v. *Forslund, supra,* 225 Cal.App.2d 476, 501; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 474; and *Ashwell* v. *Ashwell, supra,* 135 Cal.App.2d 211, 218.) ▇ Nevertheless, it appears that the mother may have been prejudiced by the admission, over objection, of the hearsay statement of the maternal grandparents, and by information received by the court from a secret report of the domestic relations investigator. The order should therefore be reversed.

V

The problem of disposing of a child custody matter on appeal is posited in *Stack* v. *Stack, supra,* as follows: "It may be that the court's order has worked out well; it may have been detrimental to the child and the parents. We have no way of knowing. Every decision dealing with this question starts with the primary object to be achieved, which is the welfare of the child. How can an appellate court, 16 months or more after the order is made, take any intelligent action? If we were to reverse, we would change a 'status quo' of 16 months duration without having any knowledge as to what the current situation is. Had a stay been granted, the same problem would arise upon affirmance."[7] (189 Cal.App.2d at p. 359. See also *Dahl* v. *Dahl, supra,* 237 Cal.App.2d 407, 414-416; and *Coddington* v. *Coddington, supra,* 210 Cal.App.2d 96, 100-101.)

In *Stack* the court affirmed the order and concluded: "It is apparent to us that over the years the appellate courts have almost completely abdicated in this field in favor of the trial courts. This may well be the only practicable course, particularly because of the length of time between the making of an order and the decision on appeal." (189 Cal.App.2d at pp. 372-373.) In this case, however, there has been no adjudication, and error has been found. The problem of disposition remains.

*Coddington,* while recognizing the problem, did not have to meet it because "The order made by the trial judge was clearly experimental, calling for a reexamination one year later." (210 Cal.App.2d at p. 101.)

In *Dahl* the court found that there was error because the complaining mother had been denied procedural due process (237 Cal.App.2d at p. 414). Nevertheless, the court denied the mother any relief. The court, after recognizing the problem posed by the passage of time between the making

---

[7]In this matter the mother applied for a writ of supersedeas on March 16, 1970 and the application was denied by this court on March 20, 1970 (1 Civ. 27990).

of the order and the decision on appeal, pointed out, "During all of this period the superior court in this very proceeding has had continuing jurisdiction to hear, consider and determine, motions for custody changes. (Civ. Code, § 138 [now § 4600].) Motions for modification of child custody can be made at any time and when made will be decided on the basis of conditions existing *at the time of the hearing. (Munson v. Munson,* 27 Cal.2d 659. . . .)" (*Id.,* p. 415.) It then stated, "If we were to reverse, the court, regardless of its findings regarding the old report, would still be obligated to ascertain which parent should have custody based upon the child's best interests as of the time of such new hearing. And since at the prior hearing Mrs. Dahl, by her own admissions, was shown to be an unrehabilitated and unrepentant woman, the burden would inevitably be hers (1) to prove herself both a fit and proper person presently; and (2) to establish that it would be to the best interests of the child to remove him from his present home and environment and subject him to another readjustment. Presumably a new probation report would be required as an aid to the court in making that determination. That report and not the one made in 1964 should be the one to be tested. All of these things can be better determined by a new motion, leaving the court unfettered by the necessity of a time-wasting re-examination of a no-longer-relevant report." (*Id.,* pp. 415-416.)

In this case the mother has not been shown to be "an unrehabilitated and unrepentant woman." If she has been treated unjustly that injustice should not be compounded by requiring her to overcome in new proceedings implied findings which were arrived at on an improper record. There is a middle ground. The order should be reversed, and the matter should be remanded to the trial court with instructions to preserve the custody and visitation rights[8] existing at the time this decision becomes final, and to set the matter for hearing for a proper review of the circumstances which gave rise to these proceedings *and* the circumstances which have developed in the interim, in order to determine, in the light of all those circumstances, to whose custody the child should be entrusted in her best interests. Whether or not the injustice done the mother may be righted will depend in the last analysis on the best interests of the child as they presently appear. The burden should remain with the father to establish that the circumstances, including a second shift in the custody of the child, render things so unequal so that the general rule of maternal custody for a child of tender years should not apply. The mother can ask no more.

The order is reversed, and the case is remanded to the trial court with

---

[8]The Superior Court file (see fn. 7 above) indicates that as of June 17, 1970 a stipulated order was filed setting forth the express visitation rights of the mother. Although the stipulation recognizes the custody of the father, it does not expressly stipulate to that custody so as to render the appeal moot.

instructions to preserve the status of the parties and the child at the time this decision becomes final, and to conduct further proceedings in accordance with the views set forth in this decision.

Molinari, P. J., and Elkington, J., concurred.